SAM J. VECCHIO, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11928–91.          Filed August 15, 1994.

*Robert J. Vecchio,* for petitioner.
*Dawn Marie Krause,* for respondent.

PARKER, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the taxable year 1980 in the amount of $286,693. In an amendment to answer, respondent later asserted an increased deficiency of $349,198.25.

After concessions,[1] the primary issue to be decided is the amount of gain resulting from the sale of real property by Johanna Properties Partnership that properly is allocable to petitioner and includable in his income in the taxable year 1980. In reaching our decision on the primary issue, we must initially determine how the gain should be allocated among the three partners' interests in the partnership. We must then determine whether petitioner's purchase of another partner's interest in the partnership occurred prior to or subsequent to the partnership's sale of the real property. Finally, we must determine how the gain allocable to the

---

[1] Respondent denied petitioner's deductions for a rental loss in the amount of $8,429 and for attorney's fees in the amount of $48,500. Petitioner concedes that he is not entitled to a deduction for the rental loss. The parties agree that petitioner is entitled to a deduction for attorney's fees in the amount of $24,500. Petitioner concedes that he is not entitled to deduct the remaining $24,000 of the attorney's fees. Respondent also determined that petitioner is entitled to a net operating loss carryover deduction of $126,241 for the taxable year 1980 from a net operating loss petitioner sustained in 1978. The adjustment for the net operating loss carryover from 1978 is not in dispute. The record does not indicate which of petitioner's activities generated the net operating loss carryover from 1978. Respondent does not allege that it arose from the operations of Johanna Properties Partnership, which is the focus of this case.

purchased interest is to be apportioned between petitioner and the selling partner.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

I. *General Background*

Petitioner is an individual who resided in Aurora, Ohio, at the time he filed the petition in this case. Petitioner is a partner in Johanna Properties Partnership, an Ohio general partnership (Johanna Properties or the partnership). The original partners in Johanna Properties were John Takacs (Takacs) and Development Systems, a California general partnership in which petitioner is a general partner.[2] Development Systems is an entity through which petitioner borrows money and holds interests in other partnerships, including at one time Johanna Properties.

On January 1, 1974, Equity Johanna, an Ohio limited partnership (Equity), became a partner in Johanna Properties. On that date, Johanna Properties, Takacs, Development Systems, and Equity executed a document titled a First Amendment to Partnership Agreement and Agreement to Admit Additional Partner (the partnership agreement). The purpose of the partnership agreement was to admit Equity as a partner in Johanna Properties and to set forth the terms and conditions for conducting the business of the partnership. Development Systems and Takacs are sometimes referred to in the partnership agreement as "Original Partners". Equity is sometimes referred to in the partnership agreement as "Investment Partnership" or "Investor Partnership". Amendments to the partnership agreement required the approval of all of the partners.

---

[2] In 1980, although Bernard Schneier was also a partner in Development Systems, petitioner was entitled to receive 100 percent of the profits and losses from Development Systems.

## II. *Johanna Properties' Partnership Agreement*

### A. *Contributions to Capital*

The partnership agreement required Equity to make a capital contribution to the partnership in the amount of $766,100. In the event additional funds were needed for financing or operating expenses (including guarantee payments to Equity), Development Systems and Takacs had a joint and several obligation to contribute such required funds.

### B. *Allocation of Profits and Losses*

Except for the profits or losses arising from the disposition of partnership assets, profits and losses in general were considered to have been earned ratably over the period of the fiscal year of the partnership. Profits or losses arising from the disposition of assets were to be taken into account as of the date of the disposition.

The partnership agreement allocated the partnership's profit and loss as follows:

Section 4.1 *Allocation of Profit and Loss.*

(a) From January 1, 1974 to December 31, 1974, the net profits and losses including depreciation of the Operating Partnership shall be divided among the Partners as follows:

| | |
|---|---|
| Development Systems | 18% |
| John Takacs | 2% |
| Equity | 80% |

(b) In the event that the Partnership operates at a loss between January 1, 1975 and December 31, 1975, then and in that event the division of losses including depreciation shall remain the same as above provided in 4.1(a); in the event the Partnership operates at a profit then, such profits (excluding depreciation which shall be divided as above provided) shall be divided in the following percentages:

| | |
|---|---|
| Development Systems | 45.9% |
| John Takacs | 5.1% |
| Equity | 59.0% [sic] |

(c) From January 1, 1976 to December 31, 1978, net profits and losses, excluding depreciation, which shall be divided as above provided in 4.1(a), shall be divided in the following percentages:

| | |
|---|---|
| Development Systems | 45.9% |
| John Takacs | 5.1% |
| Equity | 49.0% |

(d) After January 1, 1979, the net profits and losses including depreciation of the Operating Partnership shall be divided between the Operating Partners and Equity in the following percentages:

| | |
|---|---|
| Development Systems | 45.9% |
| John Takacs | 5.1% |
| Equity | 49.0% |

(e) Any gain resulting under Section 1245(a) and 1250(a) of the Internal Revenue Code of 1954, as amended, or any comparable provision, shall be allocated to the partners in the exact ratio in which the depreciation deductions giving rise to such gain were themselves allocated.

## C. *Capital Accounts*

The partnership agreement required maintenance of a capital account for each partner. The amount of each partner's capital contribution and his share of partnership profits were required to be credited to his capital account. Distributions to each partner and his share of partnership loss were required to be charged to his capital account.

With regard to any negative capital account balance, section 4.4(b) of the partnership agreement provided:

Except to the extent guarantee payments are made, if at any time the Partnership shall suffer a loss as a result of which the capital account of any Partner shall be a negative amount, such loss shall be carried as a charge against his capital account, and his share of subsequent profits of the Partnership shall be applied to restore such deficit in his capital account.

## D. *Nonliquidating Distributions*

The partnership agreement provided for the payment of management fees totaling $30,000 annually.[3] Equity was entitled to annual guarantee payments of $80,440. Cash-flow was to be distributed pro rata for payment of the management fees and to Equity for its guarantee payment prior to any distributions to Development Systems or Takacs. If the total amount available from cash-flow exceeded the amount required to pay the management fees and guarantee payment, such excess was to be distributed first pro rata to Development Systems and Takacs, up to $75,352.50 to Devel-

---

[3] The Original Partners had the right to select a company to manage the property.

opment Systems and \$8,372.50 to Takacs. Any cash-flow in excess of \$194,165 (\$30,000 + \$80,440 + \$75,352.50 + \$8,372.50) was to be distributed 30 percent to Equity, 63 percent to Development Systems, and 7 percent to Takacs.

The partnership agreement provided that, in the event of a sale of the partnership's real property, after payment of all mortgage indebtedness, taxes, and closing costs, Equity was to receive all cash up to the amount of \$766,100 (its capital contribution to the partnership). Thereafter, Equity was to receive 10 percent of all additional funds until it had received 49 percent (counting the \$766,100), Development Systems had received 45.9 percent, and Takacs had received 5.1 percent of the cash distribution.[4] Thereafter all funds were to be distributed 49 percent to Equity, 45.9 percent to Development Systems, and 5.1 percent to Takacs.

## E. *Termination, Liquidation, and Amendment*

Under the partnership agreement, the partnership would terminate upon: (a) The sale of all or substantially all of the partnership's assets; (b) the retirement of a partner if no partner remained; or (c) the transfer of the partnership's assets and liabilities to a successor entity. Upon termination, the assets would be applied first to the payment of the liabilities of the partnership (other than any loans or advances that may have been made by the partners to the partnership) and the expenses of liquidation.[5] Next, remaining assets would be used to repay any loans or advances made by partners to the partnership. Finally, liquidating distributions to the partners would be made as follows:

Section 10.4 *Distribution.* The remaining assets shall be divided pro rata among all of the Partners in accordance with their respective interests in the Partnership as set forth in Section 4.1(a) hereof, provided, however, that Equity shall, if sufficient proceeds remain, receive all cash distributions until its return received is equal to Seven Hundred Sixty-Six Thousand One Hundred Dollars (\$766,100.00).

---

[4] The partnership agreement does not specify how the 90 percent was to be distributed between Development Systems and Takacs. We assume, however, that it must have been in a ratio of 45.9 to 5.1 in order to bring the three partners to the required percentages.

[5] A reasonable time was permitted for the orderly liquidation of the assets of the partnership and the discharge of liabilities to creditors so as to enable the original partners to minimize the normal losses attendant upon a liquidation.

Amendments to the partnership agreement required the approval of all of the partners.

## III. *The Transactions and the State Court Decision*

Development Systems served as the managing partner of Johanna Properties until August 1, 1977, at which time it transferred all of its interest in Johanna Properties directly to petitioner. Thus, on August 1, 1977, the partners of Johanna Properties were Takacs, Equity, and petitioner. At some point Takacs withdrew from the partnership and a new partner was admitted, so that, on January 12, 1979, the partners of Johanna Properties were Equity, petitioner, and Lawrence Berzon (Berzon).[6] On that date, Equity held a 49-percent interest, petitioner held a 47.5-percent interest, and Berzon held a 3.5-percent interest in Johanna Properties.[7]

The main asset of Johanna Properties was a commercial building located at 3690 Orange Place, Beachwood, Ohio (the real property). At some point, a dispute arose between petitioner and Equity with regard to the management of the real property. As a result, they entered into an agreement whereby they would jointly manage the real property. The arrangement proved to be unsatisfactory. Petitioner wanted to allocate the income from the real property to the building and retain it in the partnership. Equity wanted to allocate and distribute the income to Equity. Because the partners were unable to resolve their differences, Equity filed an action in State court.

On May 8, 1980, the State court entered a final judgment resolving the rights of Equity and of petitioner in Johanna Properties. The judgment required petitioner to purchase all of Equity's interest in Johanna Properties on or before September 30, 1981. In the event petitioner did not purchase Equity's interest in Johanna Properties on or before that date, the final judgment required petitioner to assign and transfer to Equity on that date one-half of his interest (23.75 percent) in Johanna Properties.

---

[6] The record does not indicate how the shift in the partners' interests or the withdrawal of Takacs and admission of Berzon came about.

[7] These holdings represent the partners' shares of operating net profits and losses. These interests do not necessarily represent a partner's "interest in the partnership" for purposes of sec. 704(b).

The final judgment set a purchase price for Equity's interest in Johanna Properties of $1,498,000, without interest, reduced by the following amounts: (1) Upon the signing of the final judgment, $50,000 payable to Equity by check dated and collectible on May 20, 1980; (2) one-half of the cash distributed by Johanna Properties to Equity on or after May 8, 1980; and (3) in the event the purchase occurred before September 30, 1981, $222 for each day prior to that date.

Petitioner was to pay Equity the purchase price in installments. On the date of closing, Equity was to receive $1,055,000 in cash, less the amounts above previously credited. The balance was to be paid, without interest, in two equal installments. The first installment would be due 1 year after the date of the closing, and the second installment would be due 2 years after the date of closing. The installment payments were to be secured, if available, by (1) an unconditional pledge of bona fide contribution notes of limited partners purchasing an interest in Johanna Properties in an amount equal to the installment payments, (2) an unconditional assignment of a portion of a mortgage of purchasers securing payments for the sale of the real property in an amount equal to the installment payments, or (3) other acceptable security.

Petitioner was to continue to manage and operate Johanna Properties and the real property until the consummation of the sale of Equity's interest to petitioner or the transfer of one-half of petitioner's interest to Equity. With certain exceptions, petitioner agreed to indemnify Equity against any and all loss or claims arising out of litigation instituted against Equity or Johanna Properties by reason of Equity's being a partner in Johanna Properties. Prior to his purchase of Equity's interest, petitioner could not sell an interest in Johanna Properties or its realty, unless he first offered to sell the interest or realty to Equity at the same price contained in a bona fide offer from a third party willing to purchase.

The State court's final judgment superseded portions of the partnership agreement. Except as otherwise provided in the final judgment, the partnership agreement remained in full force and effect until the consummation of the sale of Equity's interest to petitioner or the transfer of petitioner's interest to Equity.

On November 17, 1980, Johanna Properties entered into a sale agreement to sell the real property to a third party. On December 10, 1980, Johanna Properties sold the real property for $8,512,000, of which $3,629,728 was received in the year of the sale.

Equity cooperated in the sale and asserted its claim to be paid from the sale proceeds. Petitioner refused, asserting that he was not required to pay Equity until September 30, 1981. Equity filed a motion with the State court demanding a share of the sale proceeds according to the provisions of the partnership agreement rather than the fixed price specified in the final judgment. The issues the State court was called upon to resolve were (1) whether petitioner acted contrary to the final judgment of the State court by not paying Equity from the proceeds of the sale on the date the realty was sold; and (2) if so, whether Equity was thereby entitled to a share of the proceeds as defined in the partnership agreement rather than the agreed fixed price as set forth in the final judgment.

On April 6, 1981, the State court, in lieu of a more formal memorandum, issued a letter setting forth its opinion regarding the prior litigation between the parties and clarifying the final judgment. Finding that petitioner had acted contrary to the spirit of the final judgment and that Equity was entitled to be paid on the date of sale, the State court ruled that Equity's tradeoff for accepting a fixed buyout price without interest up to September 30, 1981, was security for its investment. The State court concluded: "The parties were still partners with a continuing interest secured by the realty with all rights, powers and duties attendant thereto." The State court noted that, although petitioner had the right to sell the property (subject to Equity's right to meet the third party's offer) and the resulting opportunity to realize a profit greater than the fixed price (of Equity's partnership interest) stated in the final judgment, petitioner also assumed the risk of diluting his interest in the partnership if he failed to purchase Equity's interest on or before September 30, 1981.

In addition, the State court clarified the following: (1) The final judgment superseded portions of the partnership agreement and was to be read together with the remaining portions of the partnership agreement; (2) pursuant to the partnership agreement, the sale of the real property caused the

termination of the partnership; (3) the sale of the real property triggered the termination of the partnership, and that in turn caused the date of the sale of the real property to become the closing date for petitioner's purchase of Equity's interest in Johanna Properties, i.e., "the date on which Equity's partnership interest is transferred to Vecchio [petitioner]"; (4) prior to the time Equity's interest was transferred to petitioner, income from the real property could not be distributed unless Equity simultaneously received its share, which was to be credited to the purchase price; (5) the final judgment gave petitioner the right to manage the real property so long as it continued as a partnership asset; (6) upon sale of the real property, the judgment did not give petitioner complete right to manage the termination of the partnership in a manner of his own choosing; (7) no provision was made in the final judgment as to the conduct of the partnership as between the parties after the sale of the realty for the simple reason that no further relationship between Equity and petitioner after that time was contemplated; and (8) petitioner should have bought out Equity at the time of sale of the realty on December 10, 1980.

The State court credited petitioner with $70,000 cash previously distributed from Johanna Properties to Equity and $222 per day for early payment, which computed to be $65,268 (294 days × $222 per day), using December 10, 1980, as the proper closing date. The State court ordered petitioner to pay Equity the final purchase price of $1,362,732 ($1,498,000 − $70,000 − $65,268). The amount of $985,000 ($1,055,000 payment due on closing less $70,000) due on December 10, 1980, was to be paid with interest from the sale date of December 10, 1980, until actual payment was made to Equity. The balance of $377,732 was payable in two equal installments of $188,866, payable on December 10, 1981, and December 10, 1982, and secured by $430,000 in securities held in escrow.

## IV. *Johanna Properties' 1980 Partnership Return*

During all of this time, petitioner maintained the books and records for Johanna Properties and assisted in the preparation of the partnership's tax returns.

Johanna Properties elected to report its gain from the sale of the real property on the installment method under section 453. As a result, Johanna Properties had a gross profit of $4,659,832 and a gross profit ratio of 54.74 percent. The portion of gain from the installment sale taxable in 1980 was $1,986,913.

The U.S. Partnership Return of Income (Form 1065) of Johanna Properties for the taxable year 1980 indicates that the partnership sold the real property on December 10, 1980. Computation of Installment Sale Income (Form 6252) and Statement 5 attached to the return provide the following information regarding the installment sale of the real property:

| Item | Amount |
| --- | --- |
| Sale price | $8,512,000 |
| Cost or other basis | 5,611,703 |
| Depreciation allowed or allowable | 1,898,160 |
| Adjusted basis | 3,713,543 |
| Expenses of sale | 138,625 |
| Adjusted basis + expenses of sale | 3,852,168 |
| Gross profit | 4,659,832 |
| Payments received in current year | 3,629,728 |
| Taxable part of installment sale | [1] 2,034,558 |
| Ordinary income under recapture rules | 220,371 |
| Sec. 1231 gain | 1,814,187 |
| Deferred gain on installment sale | [2] 2,625,274 |
| Gross profit ratio | 54.74426% |

[1] The amount of gain to be reported in the year of the sale indicated on Form 6252 is incorrect and exceeds the correct amount by $47,645 ($2,034,558 − $1,986,913). The parties have stipulated, and we have found, that the portion of the gain from the installment sale taxable in 1980 is $1,986,913.

[2] The correct amount of deferred gain on the installment sale is $2,672,919 ($4,659,832 − $1,986,913).

The Supplemental Schedule of Gains and Losses (Form 4797) attached to the return indicates that $1,814,187 of the gain recognized in the year of the sale was taxable as capital gain and $220,371 was taxable as ordinary income under section 1250.[8]

Equity's Schedule K–1 (K–1), attached to the partnership's 1980 return, indicates that Equity had a negative capital account balance at the beginning of the year in the amount

[8] The $47,645 error noted in the table in the text is also carried over into the Form 4797.

of $1,251,898, and a capital account balance of zero at the end of the year. It also indicates that Equity made a contribution to capital in the amount of $30,953 and received distributions in the amount of $70,000 that year.

Petitioner's K–1, attached to the partnership's 1980 return, indicates that petitioner had a positive capital account balance at the beginning of the year in the amount of $78,544, and a positive capital account balance at the end of the year in the amount of $3,039,142. It also indicates that petitioner received distributions in the amount of $182,053.

Berzon's K–1, attached to the partnership's 1980 return, indicates that he had a positive capital account balance at the beginning of the year in the amount of $158,433, and a positive capital account balance at the end of the year in the amount of $177,351. It also indicates that he did not receive any distributions during the year.

The partnership allocated to the partners ordinary loss from partnership operations and gain from the sale of the real property as follows:

| Item | Petitioner | Equity | Berzon | Total |
|---|---|---|---|---|
| Net loss from rents | ($81,237) | ($127,723) | ($13,020) | ($221,980) |
| Interest income | 5,366 | 8,436 | 860 | 14,662 |
| Total ordinary loss | (75,871) | (119,287) | (12,160) | (207,318) |
| Net sec. 1231 gain | 498,767 | 1,302,250 | 13,170 | 1,814,187 |
| Specially allocated gain | 112,389 | 107,982 | -0- | 220,371 |
| Total year of sale gain | 611,156 | 1,410,232 | 13,170 | 2,034,558 |
| Deferred gain | 2,607,366 | -0- | 17,908 | 2,625,274 |
| Total gain on sale | 3,218,522 | 1,410,232 | 31,078 | 4,659,832 |

All of the partners agreed to the above allocations as reported on Johanna Properties' tax return.

Petitioner's K–1 from Johanna Properties indicates that he acquired a partnership interest on December 10, 1980, and that a part of his interest was acquired at some time from another partner. Equity's K–1 from Johanna Properties for the taxable year 1980 indicates that Equity's partnership interest decreased from 49 percent to zero percent and terminated during the year.

## V. *Petitioner's 1980 Individual Return*

Petitioner reported the gain from the sale of the real property by Johanna Properties as passing through Development Systems.[9] Petitioner reported net loss from Development Systems in the amount of $204,951, which included the $75,871 ordinary loss from Johanna Properties.[10] He reported total long-term capital gain in the amount of $500,577, which included gain in the amount of $20,585 from the sale of petitioner's residence and gain in the amount of $479,992 from Development Systems. The long-term capital gain from Development Systems included $28,725 from Kennedy Road Properties, in addition to gain from the sale of the real property by Johanna Properties.[11] Thus, petitioner reported long-term capital gain in the amount of $451,267 ($479,992 − $28,725) from the sale of the real property by Johanna Properties. In addition to the long-term capital gain, petitioner reported specially allocated ordinary gain from Development Systems in the amount of $112,389.[12]

Thus, on his 1980 return, petitioner reported $75,871 ordinary loss, $451,267 long-term capital gain,[13] and $112,389 specially allocated ordinary gain attributable to Johanna Properties. Consequently, petitioner reported a total of

[9] Petitioner did not explain why he reported the gain as passing through Development Systems. We note, however, that when his accountant testified, the accountant was under the erroneous impression that Development Systems, rather than petitioner, was the partner in Johanna Properties.

[10] On its U.S. Partnership Return of Income (Form 1065) for 1980, Development Systems reported ordinary loss from other partnerships in the amount of $204,951, which included the ordinary loss of $75,871 from Johanna Properties. It reported gain from the sale or exchange of property from other partnerships in the amount of $527,492 on a Supplemental Schedule of Gains and Losses (Form 4797).

The K–1's attached to Development Systems' return indicate that petitioner's share of partnership profits was 100 percent. Petitioner's K–1 from Development Systems allocates to him ordinary loss in the amount of $204,951, other gain under sec. 1231 in the amount of $527,492, and specially allocated ordinary gain in the amount of $112,389 as his distributive share of partnership items. We note that the specially allocated gain was omitted from the partnership's K–1.

[11] On Schedule D attached to his 1980 U.S. Individual Income Tax Return (Form 1040), petitioner reported total long-term capital gain in the amount of $500,577 consisting of gain from the installment sale of the residence (Form 6252) in the amount of $20,585, and gain from Form 4797, 1. 5(a)(1), in the amount of $479,992. Petitioner recognized long-term capital gain in the amount of $28,725 from Kennedy Road Properties.

[12] On Supplemental Schedule of Gains and Losses (Form 4797), petitioner reported gain from a partnership sec. 1231 asset in the amount of $479,992 and ordinary income from Development Systems in the amount of $112,389. Petitioner reported the $112,389 ordinary income on 1. 16 of his Form 1040.

[13] Petitioner did not explain why he reported $47,500 less long-term capital gain on his return than the $498,767 allocated to him on the K–1 from Johanna Properties. We note, however, that Johanna Properties' return overstated the gain in the year of the sale by $47,645.

$563,656 total gain from the installment sale of the real property by Johanna Properties, the sum of the long-term capital gain and the specially allocated ordinary income.

## VI. *Respondent's Determination of Tax Deficiency*

In a statutory notice of deficiency dated March 20, 1991, respondent determined a deficiency in petitioner's income tax for the year 1980 in the amount of $286,693. The notice stated that petitioner realized a long-term capital gain in the amount of $943,784 from the installment sale of the real property by Johanna Properties, and long-term capital gain in the amount of $723,566 from petitioner's "sale of Equity Johanna's partnership interest in 1980". The notice further stated that petitioner should have reported long-term capital gain in the total amount of $1,716,660, based on the following computation:

| | |
|---|---:|
| Florida property (residence) | $20,585 |
| Kennedy Road properties | 28,725 |
| Johanna Properties installment sale | 943,784 |
| Equity | 723,566 |
| Total long-term capital gain | 1,716,660 |

As a result, respondent determined that petitioner's taxable income should be increased by $486,433 computed as follows:

| | |
|---|---:|
| Net long-term capital gain per return | $500,577 |
| Net long-term adjustments | 1,216,083 |
| Net long-term capital gain as adjusted | 1,716,660 |
| Less 60% | 1,029,996 |
| Net capital gain | 686,664 |
| Capital gain per return | 200,231 |
| Schedule D adjustment | 486,433 |

Respondent failed to credit petitioner with the portion of gain from the sale subject to recapture and reported by petitioner as specially allocated ordinary income in the amount of $112,389.

Petitioner timely filed a petition in this Court challenging the entire amount of the deficiency. Respondent filed an answer denying any error in the determination of deficiency. More than a year after filing the answer and shortly before trial, respondent filed a motion for leave to amend the

answer to assert that when the notice of deficiency was prepared, she believed that, on December 10, 1980, petitioner only owned 47.5-percent of Johanna Properties, but subsequently determined that petitioner owned 96.5 percent. Leave was granted, and respondent filed an amended answer.

In the amended answer, respondent asserted that when the notice of deficiency was issued, she had determined that petitioner was required to report $943,784 in capital gain in 1980 based on a 47.5-percent ownership in Johanna Properties. Respondent asserted that, at that time, however, she believed that petitioner received more than 47.5 percent of the profits from Johanna Properties. Respondent believed the amount of additional profits petitioner received was $723,566. Respondent explained that the capital gain of $943,784 from the Johanna Properties' installment sale and the capital gain of $723,566 from the sale of Equity's partnership interest in 1980 determined in the notice of deficiency are from the same transaction, specifically, Johanna Properties' sale of the real property. Respondent contends that the total amount of capital gain asserted in the notice of deficiency with regard to that transaction was $1,667,350.

Subsequent to the issuance of the notice of deficiency, respondent concluded that petitioner owned 96.5 percent of Johanna Properties at the time of the sale of the real property, instead of 47.5 percent. Consequently, in the amended answer, respondent asserted that petitioner's share of the taxable gain in the year of the sale was $1,917,371. Respondent then computed petitioner's total long-term capital gain for 1980 as follows:

| | |
|---|---|
| Florida property | $20,585 |
| Kennedy Road properties | 28,725 |
| Johanna Properties installment sale | [1]1,917,721 |
| Total long-term capital gain | 1,967,031 |

[1] There is no explanation as to why this figure is more than the immediately preceding $1,917,371.

As a result of this change, respondent asserted in the amended answer that the correct deficiency in income tax due from petitioner for 1980 is $349,198.25, representing an increase of $62,505 from that claimed in the notice of deficiency. In both the notice of deficiency and the amended

answer to petition, respondent failed to credit petitioner with the $112,389 of specially allocated ordinary gain that petitioner included in his income in 1980, which was attributable to the installment sale of the real property by Johanna Properties.

OPINION

This case demonstrates not only the complexity of partnership taxation, but also the careful consideration and analysis that should be applied in determining the tax consequences of partnership transactions. Partnership income or loss, distributions to partners, and gain on the sale of partnership interests are each taxed separately and are each subject to different provisions of the Internal Revenue Code. Generally, allocation of partnership income and loss is subject to the rules of sections 704 and 761(c), and the taxation of distributions to partners is determined by section 731. When there is a sale or exchange of a partnership interest during a taxable year, allocation of partnership income and loss is subject to the rules of sections 706, 708, and 761(c), in addition to section 704, and the gain on the sale or exchange of a partnership interest is determined by section 741.[14]

I. *Allocation of Gain From the Sale of the Real Property*

In determining his income tax, a partner must take into account his "distributive share" of each item of partnership income, gain, loss, deduction, and credit. Sec. 702(a). Each partner is taxed on his distributive share of the partnership income without regard to whether the amount is actually distributed to him. Sec. 1.702–1(a), Income Tax Regs.; see also *United States v. Basye,* 410 U.S. 441, 453 (1973). A partner's distributive share of partnership income or loss is to be determined by the partnership agreement, provided the allocation has substantial economic effect. Sec. 704(a). If the partnership agreement does not provide as to the partner's

---

[14] In the statutory notice of deficiency, respondent determined that petitioner realized long-term capital gain in the amount of $723,566 from petitioner's "sale of Equity Johanna's partnership interest in 1980". In 1980, petitioner *purchased* Equity's interest in Johanna Properties; he did not sell that interest. There is no legal basis for including in petitioner's income long-term capital gain in the amount of $723,566 from petitioner's "sale of Equity Johanna's partnership interest in 1980". The partners in Equity are the proper taxpayers for recognition of any gain on the sale of its interest to petitioner. Apparently, respondent, realizing that such a position was untenable, filed the amended answer.

distributive share, or if the partnership agreement provides for an allocation that does not have substantial economic effect, then a partner's distributive share is determined by the partner's "interest in the partnership". Sec. 704(b). A partner's interest in the partnership is determined by taking into account all facts and circumstances. *Id.*

## A. *The Partnership Agreement Allocation*

Petitioner argues that the partnership agreement required allocating the first $1,410,232 of the gain to Equity. He contends that section 4.4(b) of the partnership agreement required Equity to bring its capital account balance to zero upon the sale of its interest to him and, therefore, Equity must be allocated more of the gain on the sale of the real property. Section 4.4(b) of the partnership agreement provides as follows:

> Except to the extent guarantee payments are made, if at any time the Partnership shall suffer a loss as a result of which the capital account of any Partner shall be a negative amount, such loss shall be carried as a charge against his capital account, and his share of subsequent profits of the Partnership shall be applied to restore such deficit in his capital account.

That provision, however, merely permits a partner to continue to receive a share of partnership losses even though the loss creates a negative capital account. The provision requires that "his share of subsequent profits" be applied to restore the deficit; it does not, however, redefine his share of such profits or allocate a greater share of the profits to such partner.

For purposes of allocating partnership income or loss, a partnership agreement includes any modifications made prior to, or at, the time prescribed for filing the partnership return for the taxable year (not including extensions), provided the modifications were agreed to by all the partners, or adopted as otherwise required by the partnership agreement. Sec. 761(c). Where a modification alters the profit-sharing interests of existing partners and does not result in the retroactive allocation of partnership income or losses to a new partner, the courts generally have given effect to the amended provision, provided the allocation has substantial economic effect. See *Smith v. Commissioner,* 331 F.2d 298,

301 (7th Cir. 1964), affg. T.C. Memo. 1962–294; *Foxman v. Commissioner,* 41 T.C. 535, 554 (1964), affd. 352 F.2d 466 (3d Cir. 1965).[15]

Johanna Properties' partnership agreement specifies that after January 1, 1979, the net profits and losses including depreciation of the partnership were to be divided among the partners in the following percentages:

| | |
|---|---|
| Development Systems | 45.% |
| John Takacs | 5.1 |
| Equity | 49.0 |

Prior to January 12, 1979, Takacs withdrew from the partnership, Berzon obtained a 3.5-percent interest in the partnership, and petitioner obtained Development Systems' interest plus an additional 1.6-percent interest. Those events modified the partnership agreement so that in 1980, prior to the sale of the real property and prior to petitioner's purchase of Equity's interest in the partnership, profits and losses were allocated 47.5 percent to petitioner, 49 percent to Equity, and 3.5 percent to Berzon.

Johanna Properties' partnership agreement further provides that profits and losses arising from the disposition of assets were to be taken into account as of the date of disposition. Thus, the gain from the sale of the property was to be taken into account as of the sale date, December 10, 1980.

The final judgment of the State court further amended Johanna Properties' partnership agreement. The final judgment, however, does not specify how the gain on any sale of the property should be allocated between Equity and petitioner. There is nothing in any of the pertinent written documents that would alter the profit-sharing percentages explicitly set forth in the partnership agreement.

A modification, however, need not necessarily be written, unless the partnership agreement so requires. Sec. 1.761–1(c), Income Tax Regs. Johanna Properties' partnership agreement does not require a modification to be in writing or prohibit an oral modification. Petitioner testified that Equity agreed that the gain from the sale of the real property would be shared as reported by Johanna Properties on its return.

A portion of the gain Johanna Properties realized on the sale of the property was attributable to the recapture of the

---

[15] See also *Martin v. Commissioner,* T.C. Memo. 1982–226.

depreciation previously deducted from the partnership's basis in the property. Petitioner testified that, because Equity had a negative capital account balance resulting from the disproportionate allocation of depreciation deductions to Equity, all the partners agreed that the gain from the sale of the real property would be allocated first to Equity in an amount necessary to restore its negative capital account to zero. That amount, $1,410,232, was determined as follows:

| | |
|---|---|
| Beginning year balance | ($1,251,898) |
| Capital contributed during year | 30,953 |
| Share of 1980 ordinary loss | (119,287) |
| Distribution during year | (70,000) |
| Capital account balance prior to allocation of gain | (1,410,232) |

Johanna Properties realized $4,659,832 of gain on the sale of the property, of which $1,986,913 was taxable in 1980. The first $1,410,232 of the realized gain was allocated to Equity. The balance of the realized gain was allocated $3,218,522 to petitioner and $31,078 to Berzon. The $1,986,913 of gain taxable in 1980 was allocated $1,410,232 to Equity, $13,170 to Berzon, and the balance to petitioner.

We found petitioner to be a credible witness as to the partnership's method of allocating the gain and the partners' agreement to such allocation. The allocation will be recognized provided it has substantial economic effect or otherwise satisfies the requirements of section 704.

## B. *Substantial Economic Effect*

Before 1976, section 704(b)(2) provided that a special allocation under a partnership agreement would not be recognized if its principal purpose was to avoid or evade any income tax. Section 1.704–1(b)(2), Income Tax Regs., was promulgated under the prior law and provided several tests to determine tax evasion or avoidance. The regulations' "substantial economic effect" test became the preeminent test for determining whether the principal purpose was tax evasion or avoidance. *Harris v. Commissioner,* 61 T.C. 770, 785 (1974); *Orrisch v. Commissioner,* 55 T.C. 395 (1970). In the Tax Reform Act of 1976, Pub. L. 94–455, section 213(d), 90 Stat. 1520, 1548, Congress elevated the "substantial economic effect" test from the regulation to the statute.

Regulations setting forth the requirements for substantial economic effect were issued on December 31, 1985, and made effective for taxable years beginning after December 31, 1975.[16] The regulations provide that the determination of whether an allocation has substantial economic effect involves a two-part test. Sec. 1.704–1(b)(2)(i), Income Tax Regs. Under the first part of the test, the allocation must have economic effect. Sec. 1.704–1(b)(2)(ii), Income Tax Regs. Under the second part, the economic effect of the allocation must be substantial. Sec. 1.704–1(b)(2)(iii), Income Tax Regs. For taxable years beginning after December 31, 1975, but before May 1, 1986, an allocation that does not satisfy the two-part test nonetheless will be respected if the allocation has substantial economic effect as interpreted under the relevant case law and the legislative history of section 213(d) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, 1548. Sec. 1.704–1(b)(1)(ii), Income Tax Regs.

### 1. *Economic Effect*

In order to have economic effect, the partnership agreement must satisfy three requirements provided in section 1.704–1(b)(2)(ii)(*b*), Income Tax Regs. An allocation of income, gain, loss, or deduction (or item thereof) to a partner will have economic effect if, and only if, throughout the full term of the partnership, the partnership agreement provides that (1) the partners' capital accounts be kept in accordance with the regulations, (2) liquidating distributions be made in accordance with positive capital account balances, and (3) a partner be required to restore a deficit capital account balance following the liquidation of the partnership or of his interest in the partnership. Sec. 1.704–1(b)(2)(ii)(*b*), Income Tax Regs. An allocation does not have economic effect if it fails to satisfy any one of the three parts of the test. In this case, special allocation of the gain taxable in the year of the sale fails all three parts of the test.

### a. *Maintenance of Capital Accounts*

The regulations require that each partner's capital account be increased by his share of partnership gain as computed for

---

[16] The regulations promulgated under sec. 704(b) for the year at issue were published on Dec. 31, 1985, T.D. 8065, 1986–1 C.B. 254.

book purposes (book gain).[17] Sec. 1.704–1(b)(2)(iv)(*b*), 1.704–1(b)(2)(iv)(*g*), Income Tax Regs. Johanna Properties realized $4,659,832 of gain on the sale of the property, of which $1,986,913 was reportable in 1980. The realized gain was allocated $1,410,232 to Equity, $3,218,522 to petitioner, and $31,078 to Berzon. The partners' capital account balances were properly adjusted to reflect that allocation. The partners' capital account balances, however, cannot be further adjusted to reflect the allocation of the portion of the gain taxable in the year of the sale. Thus, although the partnership properly elected to report the gain from the sale under the installment sale provisions of section 453, the partners' capital accounts must be adjusted to reflect the entire book gain realized in the year of the sale. The partners' shares of corresponding taxable gain for 1980 are not independently reflected by further adjustments to the partners' capital accounts. This result is further demonstrated by the fact that the capital accounts will not be further adjusted in later years as the deferred gain is recognized. Thus, separate allocation of these tax items cannot satisfy the first requirement of the economic effect test. See sec. 1.704–1(b)(4)(i), Income Tax Regs.

---

[17] Sec. 1.704–1(b)(2)(iv)(*b*), Income Tax Regs., provides that the partners' capital accounts be maintained as follows:

(*b*) *Basic rules.* Except as otherwise provided in this paragraph (b)(2)(iv), the partners' capital accounts will be considered to be determined and maintained in accordance with the rules of this paragraph (b)(2)(iv) if, and only if, each partner's capital account is increased by (*1*) the amount of money contributed by him to the partnership, (*2*) the fair market value of property contributed by him to the partnership (net of liabilities secured by such contributed property that the partnership is considered to assume or take subject to under section 752), and (*3*) allocations to him of partnership income and gain (or items thereof), including income and gain exempt from tax and income and gain described in paragraph (b)(2)(iv)(*g*) of this section, but excluding income and gain described in paragraph (b)(4)(i) of this section; and is decreased by (*4*) the amount of money distributed to him by the partnership, (*5*) the fair market value of property distributed to him by the partnership (net of liabilities secured by such distributed property that such partner is considered to assume or take subject to under section 752), (*6*) allocations to him of expenditures of the partnership described in section 705(a)(2)(B), and (*7*) allocations of partnership loss and deduction (or item thereof), including loss and deduction described in paragraph (b)(2)(iv)(*g*) of this section, but excluding items described in (*6*) above and loss and deduction described in paragraphs (b)(4)(i) or (b)(4)(iii) of this section; and *is otherwise adjusted in accordance with the additional rules set forth in this paragraph (b)(2)(iv).* For purposes of this paragraph, a partner who has more than one interest in a partnership shall have a single capital account that reflects all such interests, regardless of the class of interests owned by such partner (*e.g.,* general or limited) and regardless of the time or manner in which such interests were acquired.

### b. *Liquidating Distributions*

The second requirement of the economic effect test requires that liquidating distributions are required in all cases to be made in accordance with the positive capital account balances of the partners.[18] Johanna Properties' partnership agreement provides that, upon the sale of the real property or liquidation of the partnership, Equity was to receive a return of its investment before distributions could be made to other partners. The partnership agreement does not require that liquidating distributions be in accordance with the partners' positive capital account balances. Therefore, the second requirement of the economic effect test is not satisfied, and the allocations cannot have economic effect.

### c. *Obligation To Restore Deficit Capital Account*

The third part of the economic effect test requires that the partnership agreement require a partner with a deficit capital account balance after the liquidation of his interest in the partnership, determined after taking into account all capital account adjustments for the year, to restore the amount of the deficit. Sec. 1.704–1(b)(2)(ii)(*b*)(*3*), Income Tax Regs.

Petitioner argues that section 4.4(b) of the partnership agreement requires partners to restore deficit capital account balances. As discussed above, that provision merely permits a partner to continue to receive a share of partnership losses even though the loss creates a negative capital account. The provision requires that such partner's share of subsequent profits be applied to restore the deficit; it does not redefine his share of such profits, allocate a greater share of the profits to such partner, or require a partner to contribute additional funds to the partnership to restore the deficit account. To the contrary, the agreement specifically provides that Equity, the only partner with a deficit capital account bal-

---

[18] Sec. 1.704–1(b)(2)(ii)(*b*)(*2*), Income Tax Regs., provides:

Upon liquidation of the partnership (or any partner's interest in the partnership), liquidating distributions are required in all cases to be made in accordance with the positive capital account balances of the partners, as determined after taking into account all capital account adjustments for the partnership taxable year during which such liquidation occurs (other than those made pursuant to this requirement (*2*) and requirement (*3*) of this paragraph (b)(2)(ii)(*b*)), by the end of such taxable year (or, if later, within 90 days after the date of such liquidation) * * *

ance, is not required to provide additional funds to the partnership.[19]

## 2. *Economic Effect Equivalence*

Allocations made to a partner that do not otherwise satisfy the economic effect test, nevertheless, are deemed to have economic effect, provided that, as of the end of each partnership taxable year, a liquidation of the partnership at the end of such year or at the end of any future year would produce the same economic results to the partners as would occur if all the requirements of the economic effect test had been satisfied, regardless of the economic performance of the partnership. Sec. 1.704–1(b)(2)(ii)(*i*), Income Tax Regs.; see also *Elrod v. Commissioner,* 87 T.C. 1046, 1086 n.23 (1986). Petitioner has not argued and has not demonstrated that the allocation satisfies this economic effect equivalence test.

## 3. *Prior Law*

Although the allocation does not satisfy the substantial economic effect test of the regulations, it will be permitted if it has substantial economic effect under the applicable paragraph of the regulation in effect for taxable years beginning before May 1, 1986, the relevant case law, and the relevant legislative history of the Tax Reform Act of 1976. Sec. 1.704–1(b)(1)(ii), Income Tax Regs. Guided by those provisions, the courts developed a "capital accounts analysis" to determine whether an allocation had substantial economic effect. *Ogden v. Commissioner,* 788 F.2d 252, 261 (5th Cir. 1986), affg. 84 T.C. 871 (1985); *Allison v. United States,* 701 F.2d 933, 939 (Fed. Cir. 1983); *Goldfine v. Commissioner,* 80 T.C. 843, 852–853 (1983). That analysis, however, also requires that capital accounts be properly maintained and that liquidating distributions be made in accordance with positive capital account balances. Thus, under the relevant precedent, peti-

---

[19] If the partnership agreement had satisfied the first two parts of the test (proper maintenance of capital accounts and liquidation distributions in accordance with capital accounts), but failed the third requirement (obligation to restore deficit capital account balances), the regulations provide an alternative economic effect test. Sec. 1.704–1(b)(2)(ii)(*d*), Income Tax Regs. Because the partnership agreement did not satisfy the first two parts of the test, the alternative economic effect test is not available. We note, however, that the partnership agreement does not provide for a qualified income offset or otherwise satisfy the requirements of the alternative economic effect test.

tioner has failed to demonstrate that the allocation satisfies the requirements for substantial economic effect.

## C. *Partners' Interests in the Partnership*

If the partnership agreement provides for an allocation that does not have substantial economic effect, then a partner's distributive share is determined by the partner's interest in the partnership. As stated above, special allocation of the gain taxable in the year of the sale cannot affect the capital accounts and, therefore, cannot have economic effect. The taxable gain must be allocated in accordance with the partners' interests in the partnership. A partner's interest in the partnership is determined by taking into account all facts and circumstances. Sec. 704(b). Among the relevant factors to be taken into account in determining the partners' interests in the partnership are (1) the partners' relative contributions to capital, (2) the interests of the respective partners in profits and losses (if different from that in taxable income or loss), (3) their relative interests in cash-flow and other nonliquidating distributions, and (4) their rights to distributions of capital upon liquidation. Sec. 1.704–1(b)(3)(ii), Income Tax Regs.

Section 1.704–1(b)(3)(i), Income Tax Regs., generally defines a partner's interest in the partnership as follows:

References in section 704(b) and this paragraph to a partner's interest in the partnership, or to the partners' interests in the partnership, signify the manner in which the partners have agreed to share the economic benefit or burden (if any) corresponding to the income, gain, loss, deduction, or credit (or item thereof) that is allocated. Except with respect to partnership items that cannot have economic effect (such as nonrecourse deductions of the partnership), this sharing arrangement may or may not correspond to the overall economic arrangement of the partners. * * * Thus, a partner who has a 50 percent overall interest in the partnership may have a 90 percent interest in a particular item of income or deduction. (For example, in the case of an unexpected downward adjustment to the capital account of a partner who does not have a deficit makeup obligation that causes such partner to have a negative capital account, it may be necessary to allocate a disproportionate amount of gross income of the partnership to such partner for such year so as to bring that partner's capital account back up to zero.) The determination of a partner's interest in a partnership shall be made by taking into account all facts and circumstances relating to the economic arrangement of the partners. All partners' interests in the partnership are presumed to be equal (determined on a per capita basis). However, this presumption may be rebutted by the tax-

payer or the Internal Revenue Service by establishing facts and circumstances that show that the partners' interests in the partnership are otherwise.

The regulation anticipates that, in situations where prior deductions have created a negative capital account,[20] gain may be allocated in a manner which produces the same results as an allocation that has substantial economic effect. The fundamental principle for requiring that an allocation have economic effect is that the allocation must be consistent with the underlying economic arrangement of the partners. "This means that in the event there is an economic benefit or economic burden that corresponds to an allocation, the partner to whom the allocation is made must receive such economic benefit or bear such economic burden." Sec. 1.704–1(b)(2)(ii)(a), Income Tax Regs.

As of the end of 1979, as a result of the disproportionate allocation of Johanna Properties' operating loss and depreciation deductions, Equity had a negative capital account balance. The remaining partners, petitioner and Berzon, had positive capital account balances. Respondent does not dispute that the allocation of partnership losses from those prior years was properly reflected in the partners' capital accounts.

The partner to whom the item is specially allocated for tax purposes must bear the economic burdens and benefits of that specially allocated item. *Goldfine v. Commissioner*, 80 T.C. at 851. Equity's share of partnership depreciation and losses exceeded its contribution to the partnership, which resulted in a deficit in Equity's capital account of $1,251,898 at the beginning of the year at issue. Petitioner and Berzon had positive capital account balances at the beginning of the year. Petitioner argues, and we agree, that, because Equity received the benefit of the prior deductions, Equity should bear the economic burden of gain in an amount necessary to bring its capital account to zero. Absent such allocation, the other partnership interests would have to bear part of the economic cost of the special allocation that resulted in the deficit capital account. *Elrod v. Commissioner*, 87 T.C. at 1084; *Ogden v. Commissioner*, 84 T.C. 871, 884 (1985), affd.

---

[20] Although the regulations refer to "an unexpected downward adjustment", the economic result is the same if the deduction is planned. We think that a partner's interest in the partnership is the same whether the deduction is unexpected or intentional. See 1 McKee et al., Federal Taxation of Partnerships and Partners, par. 10.02[2], at 10–57 n.153 (1990).

788 F.2d 252 (5th Cir. 1986); *Goldfine v. Commissioner,* *supra* at 852; *Harris v. Commissioner,* 61 T.C. at 786; *Orrisch v. Commissioner,* 55 T.C. at 403–404.

Furthermore, under the partnership agreement, Equity was entitled to the first $766,100 of proceeds from the sale of the partnership real property. Thereafter, additional funds were to be distributed 10 percent to Equity and 90 percent to petitioner and Berzon until Equity had received 49 percent (counting the $766,100), petitioner had received 47.5 percent, and Berzon had received 3.5 percent of the cash distribution.[21] Thereafter all funds were to be distributed 49 percent to Equity, 47.5 percent to petitioner, and 3.5 percent to Berzon. During the operation of the partnership, petitioner and Berzon (or Takacs) bore the risk that a sale of the property would not provide distributable proceeds in excess of Equity's right to the first $766,100 of proceeds. In order for the partners' capital accounts to reflect that right, gain in the year of the sale should have been allocated first to Equity's interest in an amount necessary to bring its capital account to zero ($1,410,232) and then to a positive $766,100. Therefore, the first $2,176,332 of the gain from the sale should be allocated to Equity's interest.[22] Thus the entire $1,986,913 of gain taxable in the year of the sale must be allocated to Equity's interest. This allocation of the gain taxable in the year of the sale of the real property also reflects the risk of economic loss in a later year borne by petitioner and Berzon in the event that the purchaser of the real property should fail to pay an installment due in the later year.

## II. *Petitioner's Purchase of Equity's Interest*

Respondent asserted in the amended answer that petitioner acquired Equity's 49-percent interest in Johanna Properties on May 8, 1980, and, therefore, is required to include

---

[21] The partnership agreement does not specify how the 90 percent was to be distributed between Development Systems (now petitioner) and Takacs (now Berzon). We assume, however, that it must have been in a ratio of 45.9 (now 47.5) to 5.1 (now 3.5) in order to bring the three partners to the required percentages.

[22] The allocation amount is computed as follows:

| | |
|---|---|
| Beginning of year capital account | ($1,251,898) |
| Capital contributed during year | 30,953 |
| Distributions during year | (70,000) |
| Share of 1980 ordinary loss | (119,287) |
| Gain on sale of real property | 2,176,332 |
| Ending capital account balance | 766,100 |

96.5 percent of the gain from the sale in his income for 1980. Respondent has the burden of proving issues raised in the amended answer. Rule 142(a). Under the partnership agreement, gain from the sale of the real property was to be taken into account as of the date of the disposition of the property. Therefore, if petitioner acquired Equity's interest prior to December 10, 1980, the date of the sale, he must include in his income the gain from the sale of the real property that is properly allocable to Equity's interest in the partnership.

Respondent argues that petitioner purchased Equity's partnership interest in Johanna Properties on May 8, 1980, the date the final judgment was entered by the State court. Citing *Yelencsics v. Commissioner,* 74 T.C. 1513, 1527 (1980), respondent argues that, for purposes of Federal income taxation, a sale occurs upon the transfer of the benefits and burdens of ownership rather than upon satisfaction of technical requirements for the passage of title under State law. Respondent maintains that the benefits and burdens of Equity's 49-percent partnership interest in Johanna Properties were transferred to petitioner on May 8, 1980. She alleges that the benefits transferred included the right to receive profits and the ability to benefit from appreciation in value of the real property, the only asset owned by Johanna Properties. Respondent contends that, pursuant to the State court's order, Equity was no longer entitled to a share of Johanna Properties' profits, and Equity's share of cash available for distribution was instead to be credited against the purchase price. Further, respondent asserts that Equity was relieved of all burdens of ownership because petitioner was required to indemnify Equity against all liability resulting from a default in the sale of the real property or from Equity's status as a partner in Johanna Properties. Respondent argues that all steps leading to the sale of Equity's partnership interest were negotiated and agreed upon on May 8, 1980, the price was fixed, and petitioner received all rights to manage the partnership's assets. She maintains that Equity retained legal title to the partnership interest only as security for payment and concludes that all ownership burdens and benefits passed to petitioner on May 8, 1980. We disagree.

Equity was admitted as a partner in Johanna Properties in January of 1974. Sometime before May of 1980, a dispute

arose between Equity and petitioner over the management of Johanna Properties that eventually led to the State court suit. Because they were unable to resolve the dispute, the final judgment of the State court provided a method for ending the deadlock whereby petitioner was given approximately 17 months to purchase Equity's interest. In the event petitioner did not purchase Equity's interest on or before September 30, 1981, petitioner was required to transfer to Equity one-half of his interest in Johanna Properties, which the final judgment specifies is 23.75 percent. Clearly, if Equity's 49-percent interest had transferred to petitioner on May 8, 1980, then on September 30, 1981, he would have held 96.5 percent. In that case, one-half of his interest would have been 48.25 percent and not 23.75 percent as indicated in the final judgment. Equity bore the risk that its interest in the partnership might appreciate in the interim period before petitioner purchased that interest at the fixed price set in the State court judgment. Petitioner bore the risk that his interest in the partnership would be diluted in the event he was unable to purchase Equity's interest on or before September 30, 1981. In the latter event, Equity would have received a windfall; i.e., one-half of petitioner's partnership interest for free.

The purchase price for Equity's interest was established based on a closing date of September 30, 1981, and provided for reductions for distributions from the partnership to Equity during the 17-month period and $222 per day in the event of an earlier closing date. Thus, the purchase price for Equity's interest included an agreed value for Equity's share of income from the partnership during the 17-month period.

Finally, the State court's interpretive letter specifically states that the sale of the real property by Johanna Properties caused a dissolution of the partnership. The dissolution of the partnership, in turn, advanced the closing date for the sale of Equity's interest from September 30, 1981, to the date of the sale of the real property, December 10, 1980, and triggered petitioner's obligation to purchase Equity's interest. At the time of the sale of the real property by Johanna Properties, petitioner did not own Equity's interest in the partnership. Petitioner acquired Equity's interest in the partnership after the sale of the real property.

## III. *Allocation of Gain Between Equity and Petitioner*

Next we must determine how the gain realized from the sale of the property that properly was allocated to Equity's partnership interest should be allocated between Equity as seller of that interest and petitioner as purchaser of the interest. Section 706(c)(2)(A) provides that the taxable year of a partnership closes with respect to a partner who sells his entire interest in the partnership, and the partner's distributive share of partnership income or loss for such year is determined under the regulations. Section 1.706–1(c)(2)(ii), Income Tax Regs., provides:

(ii) *Inclusions in taxable income.* In the case of a sale, exchange, or liquidation of a partner's entire interest in a partnership, the partner shall include in his taxable income for his taxable year within or with which his membership in the partnership ends, his distributive share of items described in section 702(a), and any guaranteed payments under section 707(c), for his partnership taxable year ending with the date of such sale, exchange, or liquidation. In order to avoid an interim closing of the partnership books, such partner's distributive share of items described in section 702(a) may, by agreement among the partners, be estimated by taking his pro rata part of the amount of such items he would have included in his taxable income had he remained a partner until the end of the partnership taxable year. The proration may be based on the portion of the taxable year that has elapsed prior to the sale, exchange, or liquidation, or may be determined under any other method that is reasonable. Any partner who is the transferee of such partner's interest shall include in his taxable income, as his distributive share of items described in section 702(a) with respect to the acquired interest, the pro rata part (determined by the method used by the transferor partner) of the amount of such items he would have included had he been a partner from the beginning of the taxable year of the partnership. * * *

Thus, when a partner sells or exchanges his entire interest in the partnership, his distributive share of partnership items is determined by closing the partnership books, unless the partners agree to estimate his share under a reasonable proration. If his share is determined by an interim closing of the partnership books, his taxable year ends with the date of the sale or exchange of his interest. Therefore, in this case, unless the partners agreed to reasonably prorate the items of income, Equity would be required to include in its income for 1980 the entire gain from the sale of the real property allocable to its interest, the entire $1,986,913 taxable in 1980.

The partners agreed to allocate to Equity the amount of gain necessary to bring its negative capital account to zero. Prior to the sale of its interest to petitioner, Equity had received the benefit of substantial depreciation deductions. The State court's final judgment required Equity to sell its interest, and all rights attendant thereto, to petitioner at a fixed purchase price. As a result of petitioner's purchase of Equity's interest, petitioner acquired the right to the first $766,100 of proceeds from the sale of the real property.[23] Allocating gain in an amount necessary to bring Equity's capital account to zero, $1,410,232, reflects the prior benefit Equity received from the allocation of deductions up to the time of the sale of its interest to petitioner. Allocating the remainder of the gain in the year of the sale, $576,681, to petitioner reflects petitioner's right to the first $766,100 of proceeds from the sale of the property, which right he acquired through his purchase of Equity's partnership interest. Such allocation is reasonable and in accordance with the partners' interests in the partnership during the year at issue. We hold, therefore, petitioner's share of gain from Johanna Properties' sale of the real property included as his taxable income in 1980 is $576,681.

## IV. *Conclusion*

On his 1980 return, petitioner reported total gain in the amount of $563,656 from the sale of Johanna Properties' real property. He reported $112,389 as specially allocated ordinary gain and $451,267 as long-term capital gain. This is $13,025 less than the $576,681 properly allocated to him. The parties have not disputed the amount of recaptured ordinary gain or the amount properly allocated to petitioner. Therefore, the $13,025 additional gain is reportable as long-term capital gain. As a result, petitioner is required to include $112,389 as specially allocated ordinary gain and $464,292 as long-term capital gain from the sale of the real property.[24]

---

[23] In the alternative, petitioner could have given half of his interest to Equity as of that date.

[24] In light of the fact that petitioner is entitled in 1980 to a net operating loss carryover deduction of $126,241 from 1978, the recomputation under Rule 155 may well result in an overpayment rather than a deficiency.

To reflect the parties' stipulations and concessions, and the above holding,

*Decision will be entered under Rule 155.*