VUPPARAHILI AND MEERA RAMESH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; GOPAL G. AND NEETU G. LALMALANI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ramesh v. Commissioner
Docket Nos. 21244-85, 30182-85
United States Tax Court
T.C. Memo 1995-346; 1995 Tax Ct. Memo LEXIS 351; 70 T.C.M. (CCH) 208; July 31, 1995, Filed *351 Decision will be entered under Rule 155. For petitioners: Lois C. Blaesing and Chauncey W. Tuttle, Jr.
For respondent: Mary P. Hamilton, Paul Colleran, and William T. Hayes. DAWSON, WOLFE
DAWSON; WOLFE
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE WOLFE, Special Trial Judge: These cases are part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without *352 published opinion 996 F.2d 1216 (6th Cir. 1993). The facts of the underlying transaction in these cases are substantially identical to those in the Provizer case. Through a second tier partnership, Efron Investors, petitioners Dr. Vupparahili Ramesh and Dr. Gopal G. Lalmalani invested in the Clearwater Group limited partnership (Clearwater), the same partnership considered in the Provizer case. Pursuant to petitioners' request at trial, this Court took judicial notice of our opinion in the Provizer case. In a notice of deficiency issued by certified mail on April 12, 1985, respondent determined a deficiency in the joint 1981 Federal income tax of petitioners Ramesh in the amount of $ 11,806.82. In a notice of deficiency issued by certified mail on June 13, 1985, respondent determined a deficiency in the joint 1981 Federal income tax of petitioners Lalmalani in the amount of $ 24,425 and an addition to tax in the amount of $ 3,774 under section 6651(a)(1) for failure to file their 1981 Federal income tax return timely. In the notices of deficiency, respondent also determined that interest on deficiencies accruing after December 31, 1984, would *353 be calculated at 120 percent of the statutory rate under section 6621(c). [2]
In addition to the above deficiencies and additions to tax, in amended answers respondent asserted the following additions to petitioners' Federal income taxes: Additions to Tax
Docket No.
Petitioners
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6659
21244-85
Ramesh
$ 590
[1]
$ 2,893
30182-85
Lalmalani
1,221
[1]
5,791
*354 The issues for decision are: (1) Whether the assessments are barred by the statute of limitations; (2) whether expert reports and testimony offered by respondent are admissible into evidence; (3) whether petitioners are entitled to claimed deductions and tax credits with respect to Clearwater as passed through Efron Investors; (4) whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a)(1) and (2); (5) whether petitioners are liable for the additions to tax under section 6659 for underpayments of tax attributable to valuation overstatement; and (6) whether petitioners are liable for increased interest under section 6621(c). On brief respondent conceded that petitioners Lalmalani were not liable for the section 6651(a)(1) addition to tax. FINDINGS OF FACT Some of the facts have been stipulated in each case and are so found. The stipulated facts and attached exhibits are incorporated in the respective cases by this reference. Petitioners Dr. Vupparahili and Meera Ramesh resided in Northbrook, Illinois, when their petition was filed. Petitioners Dr. Gopal G. and Neetu G. Lalmalani resided in Westmont, *355 Illinois, when their petition was filed. In 1981 petitioners Vupparahili Ramesh (Dr. Ramesh) and Gopal G. Lalmalani (Dr. Lalmalani) were practicing cardiologists. Petitioner Meera Ramesh (Mrs. Ramesh) was not employed outside the home, and petitioner Neetu G. Lalmalani (Mrs. Lalmalani) was so employed only briefly and had modest earnings. Dr. Ramesh and Dr. Lalmalani are limited partners in Efron Investors (EI), which is a limited partner in the Clearwater limited partnership. The Clearwater limited partnership is the same recycling partnership that we considered in Provizer v. Commissioner, supra. The underlying deficiencies in these cases resulted from respondent's disallowance of claimed losses and tax credits that were passed through both Clearwater and EI to petitioners Ramesh and Lalmalani. Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, supra.[3] Those facts may be summarized as follows. In 1981, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel expanded polyethylene (EPE) recyclers to ECI Corp. for *356 $ 5,886,000 ($ 981,000 each). ECI Corp., in turn, resold the recyclers to F & G Corp. for $ 6,976,000 ($ 1,162,666 each). F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. All of the monthly payments required among the entities in the above transactions offset each other. These transactions were done simultaneously. We refer to these transactions collectively as the Clearwater transaction. The fair market value of a Sentinel EPE recycler in 1981 was not in excess of $ 50,000. PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense *357 agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC based on the quality and amount of recycled scrap. In 1981, EI acquired a 43.313-percent limited partnership interest in Clearwater, Dr. Ramesh acquired a 1.596-percent limited partnership interest in EI, and Dr. Lalmalani acquired a 3.194-percent limited partnership interest in EI. As a result of passthrough from Clearwater and EI, petitioners Ramesh deducted an operating loss in the amount of $ 4,469 and claimed investment tax and business energy credits totaling $ 9,644 and petitioners Lalmalani deducted an operating loss in the amount of $ 8,944 and claimed investment tax and business energy credits totaling $ 19,302. Respondent disallowed petitioners' claimed deductions and credits related to EI's investment in Clearwater for 1981. EI is an Indiana limited partnership that was formed in May of 1981 by Morton L. Efron (Efron) as the general partner and Real Estate Financial Corp. (REFC) as the initial limited partner. Fred Gordon (Gordon) is the president of REFC, which is owned by members of Gordon's family. EI was formed to acquire limited partnership *358 interests in an office building in Buffalo, New York (the office building), and a shopping center in Haslett, Michigan (the shopping center). In contemplation of these ventures, EI prepared a private placement memorandum (the original offering memorandum) and distributed it to potential limited partners. At some time in late 1981, EI abandoned the contemplated investment in the shopping center and substituted limited partnership interests in Clearwater and a K-Mart shopping center in Swansea, Massachusetts (the K-Mart investment). The revised investment objectives were presented in a revised offering memorandum (the revised offering memorandum). The revised offering memorandum indicated that EI intended to invest in 100 percent of the limited partnership interests in the office building (10 units), 43.75 percent of the limited partnership interests in Clearwater (7 units), and 15.625 percent of the limited partnership interests in the K-Mart investment (2-1/2 units). Potential EI limited partners were informed of the change in EI's investment objectives through informal conversations and the revised offering memorandum. Petitioners Ramesh and Lalmalani became aware of the change in *359 EI's investment objectives during 1981. MFA Corp. (MFA) is the ministerial agent for EI. Efron owns 50 percent of the stock of MFA, and REFC owns the remaining 50 percent. The revised offering memorandum provides that Efron, as general partner of EI, and MFA, as the ministerial agent for EI, will receive substantial fees, compensation, and profits from EI. The contemplated payments to MFA include: (1) $ 100,000 for supervisory management of the office building and ministerial fees; (2) $ 100,000-$ 125,000 as loan commitment fees; (3) $ 25,000 for note collection guarantees; and (4) a maximum of $ 100,750 in investment advisory fees. In addition, MFA was also the ministerial agent for the office building limited partnership and, according to the revised offering memorandum, received substantial payments in that capacity. Efron obtained financing for the EI investments through local banks. Some of the limited partners in EI made a cash downpayment to EI and then signed installment promissory notes for the remainder of the purchase price. Thereafter, Efron pledged any promissory notes received from limited partners as security for loans to EI. In addition to lending funds directly *360 to EI, the banks also offered loans to individual limited partners for the downpayments needed with respect to the EI investments. Dr. Ramesh subscribed to purchase one-fourth of a limited partnership unit ($ 25,000) in EI and Dr. Lalmalani subscribed to purchase one-half of a limited partnership unit ($ 50,000). Dr. Ramesh and Dr. Lalmalani acquired their interests in EI in exchange for cash payments in the respective amounts of $ 10,081.25 and $ 20,162.50 and promissory notes bearing interest at the rate of 11 percent per year with payments due on January 15, 1982, and January 15, 1983. In 1981 Barry Swartz (Swartz) presented the potential investment in EI to Dr. Ramesh and Dr. Lalmalani. Swartz is a certified public accountant. He was Dr. Ramesh's tax return preparer from about 1978 [4] until approximately 1990, when Dr. Ramesh's cardiology practice was merged with another group. The EI investment was the first investment that Swartz had presented to Dr. Ramesh. Swartz has been Dr. Lalmalani's accountant since approximately 1979. *361 Swartz learned of EI in 1981 from Efron. Toward the end of 1981, he learned that the nature of EI's potential investments had changed. At that time, he merely reviewed the revised offering memorandum; but he did not verify any of the projections in the memorandum. Swartz did not engage in any further investigation of EI in 1981. Efron was the general partner of EI. In addition, Efron owned limited partnership interests in EI through Efron and Efron Real Estate, a partnership owned by Efron and his wife, and AMBI Real Estate, a partnership owned by Efron and his sister. EI was the first partnership for which Efron served as a general partner. Efron organized EI so that he could earn legal fees and fees for managing the partnership. He received compensation and fees as the general partner of EI and as a 50-percent shareholder of MFA. Efron learned of the Clearwater transaction from Gordon. In 1981 Gordon was counsel to EI, to Efron as the general partner of EI, to Efron personally, and to MFA. He and Efron have known each other since meeting at the University of Michigan in 1955. In the early 1960's Efron and Gordon began investing together in the stock market, real estate, business *362 loans, and other investments. Gordon is an attorney who holds a master's degree in business administration and at one time was employed by the Internal Revenue Service. Prior to the date of the Clearwater private placement offering, Gordon had experience involving the evaluation of tax shelters. Gordon was paid a fee in the amount of 10 percent of some investments he guided to Clearwater; however, he did not receive a fee directly from Clearwater for the EI investments. Efron was aware that Gordon received commissions from the sale of some units in recycling ventures. [5] Gordon recommended investing in the Clearwater offering to the investors in EI, as well as to some of Gordon's other clients. *363 Dr. Ramesh received a medical degree from an institution in southern India, completed postgraduate studies at the Medical College of Ohio, performed 1 year of a fellowship in cardiology at Dalhousie University in Canada, finished his cardiology training at Michael Reese Hospital in Chicago, and entered private practice in 1977 or 1978. Petitioner Meera Ramesh was not employed outside the home in 1981. Dr. Lalmalani has a medical degree and completed his residency in cardiology at Michael Reese Hospital in 1977. Petitioner Neetu G. Lalmalani received a bachelor of arts degree in philosophy in 1975 from an institution in India and at the time of trial had earned credit hours in pursuit of a degree in psychology at the College of Dupage. In 1981, she was employed only briefly outside the home and received compensation of less than $ 1,000 for such work. Petitioners do not have any formal training in investments. Petitioners do not have any education or work experience in plastics recycling or plastics materials. Petitioners did not independently investigate the Sentinel recyclers. Petitioners did not see a Sentinel recycler or any other type of plastic recycler prior to participating *364 in the recycling ventures. OPINION In Provizer v. Commissioner, T.C. Memo. 1992-177, a test case involving the Clearwater transaction and another tier partnership, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $ 50,000, (2) held that the Clearwater transaction was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the Clearwater transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers. Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that the investments in the Sentinel EPE recyclers in these cases were similar to the investment described in Provizer v. Commissioner, supra, *365 and, pursuant to their request, we have taken judicial notice of our opinion in the Provizer case. Petitioners Ramesh and Lalmalani invested in EI, a tier partnership that invested in Clearwater. The underlying transaction in these cases (the Clearwater transaction), and the Sentinel EPE recyclers considered in these cases, are the same transaction and machines considered in Provizer v. Commissioner, supra.
Issue 1. Statute of Limitations In their petitions, petitioners allege that the notices of deficiency were not issued within the statutory limitations period. This issue has not been addressed since petitioners' replies to answer filed October 21, 1985, and appears to have been abandoned. In a joint status report filed with this Court on March 31, 1987, in docket No. 30182-85, the parties indicated that all issues remaining in that case involved "Plastics Recycling issues". In addition, none of the trial memoranda or briefs address this issue. Regardless of whether the issue was abandoned, the record shows that the notices of deficiency in these cases were issued within the statutory limitations period. In general, section 6501(a) *366 requires assessment of tax to be made within 3 years after a return is filed, whether the return was filed on or after the date prescribed. Section 6501(b)(1) provides that if a return is filed before the due date, for purposes of section 6501, the return shall be considered filed on the due date. The joint 1981 return of petitioners Vupparahili and Meera Ramesh was due on April 15, 1982, and was filed before that date. See sec. 6072. Pursuant to section 6501(b)(1), their return is deemed filed on April 15, 1982, and was filed before that date. See sec. 6072. Pursuant to section 6501(b)(1), their return is deemed filed on April 15, 1982. Respondent mailed the notice of deficiency in docket No. 21244-85 on April 12, 1985, within the 3-year period provided by section 6501(a). The joint 1981 return of petitioners Gopal G. and Neetu G. Lalmalani was postmarked June 16, 1982, and received and filed by respondent on June 18, 1982. Respondent mailed the notice of deficiency in docket No. 30182-85 on June 13, 1985. The notice of deficiency in docket No. 30182-85 was mailed within the 3-year period of limitations provided by section 6501(a). Issue 2. Admissibility of Expert Reports *367 and Testimony
Before addressing the substantive issues in these cases, we resolve an evidentiary issue. At trial, respondent offered in evidence the expert opinions and testimony of Steven Grossman (Grossman) and Richard Lindstrom (Lindstrom). At trial and in their reply briefs, petitioners object to the admissibility of the testimony and reports. The expert reports and testimony of Grossman and Lindstrom are identical to the testimony and reports in Fine v. Commissioner, T.C. Memo. 1995-222. In addition, petitioners' arguments with respect to the admissibility of the expert testimony and reports are essentially identical to the arguments made in the Fine case. For discussions of the reports and testimony, see Fine v. Commissioner, supra, and Provizer v. Commissioner, supra.
For reasons set forth in Fine v. Commissioner, supra, we hold that the reports and testimony of Grossman and Lindstrom are relevant and admissible and that Grossman and Lindstrom are experts in the fields of plastics, engineering, and technical information. We do not, *368 however, accept Grossman and Lindstrom as experts with respect to the ability of the average person, who has not had extensive education in science and engineering, to conduct technical research, and we have limited our consideration of their reports and testimony to the areas of their expertise. We also hold that Grossman's report meets the requirements of Rule 143(f). Issue 3. Deductions and Tax Credits With Respect to EI and Clearwater
The underlying transaction in these cases is substantially identical in all respects to the transaction in Provizer v. Commissioner, T.C. Memo. 1992-177. The parties have stipulated the facts concerning the deficiencies essentially as set forth in our Provizer opinion. Based on these records, we hold that the Clearwater transaction was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Accordingly, respondent is sustained on the issue with respect to the underlying deficiencies. Moreover, we note that petitioners in both of the cases at hand have stated their concession of this issue on brief. The record plainly supports *369 respondent's determinations regardless of such concessions. For a detailed discussion of the facts and the applicable law, see Provizer v. Commissioner, supra.
Issue 4. Sec. 6653(a) Negligence
In her first amendments to answer, respondent asserted that petitioners were liable for the negligence-related additions to tax under section 6653(a)(1) and (2). Because these additions to tax were raised for the first time in respondent's amendments to answer, respondent bears the burden of proof on this issue. Rule 142(a); Vecchio v. Commissioner, 103 T.C. 170, 196 (1994). Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. In cases involving negligence, an additional amount is added to the tax under section 6653(a)(2); such amount is equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under *370 the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). Petitioners contend that they were reasonable in claiming deductions and credits with respect to EI's investment in Clearwater. To support their contention, petitioners allege the following: (1) That claiming the deductions and credits with respect to EI's investment in Clearwater was reasonable in light of the media coverage of the alleged oil crisis in the United States in 1981; (2) that in claiming the deductions and credits, they specifically relied upon Swartz; and (3) that petitioners were so-called unsophisticated investors. Dr. Ramesh and Mrs. Lalmalani testified that in late 1981 they learned that the nature of the EI investments had changed from strictly real estate to real estate and recycling. Dr. Ramesh learned of the change in EI's investments through a conversation with Swartz. He testified that *371 he "didn't pay much attention to" the conversation or the change in EI's investments. He had no understanding of how EI's investment in Clearwater was supposed to generate income, and he did not ask any questions about EI's investment in Clearwater. Mrs. Lalmalani learned of the change in EI's investment through documents [6] that she and Dr. Lalmalani received in the mail. Dr. Lalmalani did not testify. Consequently, aside from receipt by the Lalmalani household of documents concerning the change in EI's investments, the record in docket No. 30182-85 is devoid of any evidence concerning Dr. Lalmalani's knowledge of EI's investment in Clearwater. On brief petitioners argue, in general terms, that the media coverage of the so-called oil crisis in the United States in 1981 led them to believe that EI's investment in Clearwater had good economic potential. Yet, Dr. Ramesh was unaware *372 of, and the record contains no evidence that petitioners Lalmalani were aware of, how Clearwater was supposed to generate income. Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), is misplaced. The facts in the Krause case are distinctly different from the facts of these cases. In the Krause case, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology. The Krause opinion notes that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. Id. at 135-136. In holding that the taxpayers in the Krause case were not liable for the negligence-related additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970's and early 1980's to invest in EOR technology." Id. at 177. *373 In the present cases, however, one of respondent's experts, Grossman, noted that the price of plastics materials is not directly proportional to the price of oil, that less than 10 percent of crude oil is utilized for making plastics materials, and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastic products." While EOR was, according to our Krause opinion, in the forefront of national policy and the media during the late 1970's and early 1980's, there is no showing in these records that the supposed energy crisis would provide a reasonable basis for Dr. Ramesh and Dr. Lalmalani to invest in recycling of polyethylene. Moreover, the taxpayers in the Krause opinion were experienced in or investigated the oil industry and EOR technology specifically. One of the taxpayers in the Krause case undertook significant investigation of the proposed investment including researching EOR technology. The other taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials. Id. at 166. *374 In the present cases, petitioners were not experienced or educated in plastics recycling or plastics materials. They did not independently investigate the Sentinel recyclers, and they did not hire an expert in plastics to evaluate the Clearwater transaction. We consider petitioners' arguments with respect to the Krause case inapplicable. During 1980 and 1981, in addition to the media coverage of the so-called oil crisis, there was "extensive continuing press coverage of questionable tax shelter plans." Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982). On their 1981 Federal income tax returns alone, petitioners claimed investment tax and business energy credits with respect to EI's investment in Clearwater that exceeded their investment in Clearwater. The table below shows the amounts of credits related to Clearwater claimed on petitioners' 1981 Federal income tax returns and the amounts of petitioners' investments in Clearwater through EI. Investment Tax and Investment
Petitioners
Business Energy Credits
in Clearwater [1]
Ramesh
$ 9,644
$ 5,586
Lalmalani
19,302
11,179
*375 Like the taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177, "except for a few weeks at the beginning, petitioners [Ramesh and Lalmalani] never had any money in the [Clearwater] deal." In light of the large tax benefits claimed on petitioners' 1981 Federal income tax returns, we conclude that further investigation of the investment clearly was required. A reasonably prudent person would have asked a qualified independent tax adviser if this windfall were not too good to be true. McCrary v. Commissioner, 92 T.C. 827, 850 (1989). In fact, petitioners argue that they consulted a qualified adviser and relied upon him in claiming the disallowed losses and tax credits. Petitioners argue that their reliance on the advice of Swartz insulates them from the negligence-related additions to tax. Under some circumstances a taxpayer may avoid liability for the additions to tax for negligence under section 6653(a) if reasonable reliance on a competent professional adviser is shown. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), *376 affd. 501 U.S. 868 (1991). Such circumstances are not present in these cases. Moreover, reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Id. In order for reliance on professional advice to excuse a taxpayer from the negligence-related additions to tax, the reliance must be reasonable, in good faith, and based upon full disclosure. Id.; see Weis v. Commissioner, 94 T.C. 473, 487 (1990); Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974). We have rejected pleas of reliance when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. Beck v. Commissioner, 85 T.C. 557 (1985); Flowers v. Commissioner, 80 T.C. 914 (1983); Steerman v. Commissioner, T.C. Memo. 1993-447. *377 The record does not show that Swartz possessed any special qualifications or professional skills in the recycling or plastics industries. In addition, Swartz did not hire anyone with plastics or recycling expertise to evaluate the Clearwater transaction. In evaluating the revised EI offering, Swartz testified that he relied upon (1) the offering materials, (2) Samuel Winer, the general partner of Clearwater, (3) Efron, (4) Gordon, and (5) Mark Hailwell (Hailwell), an attorney. In 1981, Swartz relied solely upon the offering materials and his understanding of Efron's reputation. Swartz testified that in 1982 he contacted Winer, Efron, and Gordon, and sent a copy of the revised memorandum to Hailwell. Swartz testified that Hailwell, a friend of his, "did due diligence" with respect to EI's investment in Clearwater in 1982. Swartz' testimony was vague, providing no details of his inquiry of Hailwell or Hailwell's experience in or knowledge of the plastics or recycling industries. Swartz merely testified that Hailwell reviewed the revised offering memorandum, "had a law firm in Atlanta do due diligence * * * talked to a lot of people and did some more research on it[the revised offering *378 memorandum]." Swartz did not verify the projections in the revised offering memorandum; he merely reviewed it. Besides Swartz' testimony of his understanding that Gordon had seen the Sentinel recyclers, Swartz provided no details of his inquiries of Winer, Efron, or Gordon. Swartz testified that in evaluating EI's investment in Clearwater he relied upon Efron, and Efron testified that in evaluating the Clearwater transaction he relied upon Swartz. Efron also contends that he relied upon (1) the offering materials, (2) various bankers who loaned funds to EI, and (3) Gordon for his expertise in taxation, finance, and investments. Although Efron testified that when making investments he knows "enough to go get an expert or somebody that knows something", Efron did not consult any plastics engineering or technical experts with respect to EI's investment in Clearwater. Efron relied heavily upon Gordon in deciding to include Clearwater as a part of the revised EI offering. Efron was aware that Gordon was an offeree representative, and received commissions as such, from other recycling investments. In evaluating the Clearwater transaction Gordon relied on the offering materials and on discussions *379 with persons involved in the transaction. Efron does not suggest that Swartz or the bankers had any peculiar or specialized knowledge of the Clearwater deal beyond that of any accountant or banker who had read the prospectus. Petitioners first became aware of the Clearwater investments through EI and Swartz. Petitioners contend that they relied heavily on Swartz in making their investments in EI and in claiming the associated tax deductions and credits and that they should be relieved of the negligence-related additions to tax under section 6653(a) because of their reliance on Swartz. Swartz presented the potential investment in EI to Dr. Ramesh and Dr. Lalmalani. Dr. Ramesh testified that Swartz presented the potential EI investment to him "in terms of tax advantage." He testified that his only conversations with Swartz with respect to the EI investment concerned the amounts of tax credit and "allowance" to which he would allegedly be entitled as a result of an investment in EI. Dr. Lalmalani did not testify at trial. Swartz received payments from EI with respect to the investments of Dr. Ramesh and Dr. Lalmalani in EI. He testified that he received the fees in exchange for introducing *380 the investors to the EI investment, working with the investors, filling out the forms, reviewing the investment, and recommending the investment. We find that Swartz received commissions in exchange for finding investors for EI. We have held that in some circumstances a taxpayer's reliance on persons who are not independent of the promoter is not reasonable for purposes of section 6653(a). Horn v. Commissioner, 90 T.C. 908, 942 (1988); Vangeloff v. Commissioner, T.C. Memo. 1992-514; Provizer v. Commissioner, T.C. Memo. 1992-177; Lore v. Commissioner, T.C. Memo. 1990-56. In our view, petitioners' purported reliance on Swartz was not reasonable, in good faith, and based on full disclosure. Accordingly, we hold that petitioners are not entitled to relief from the negligence-related additions to tax under section 6653(a) because of their alleged reliance on Swartz. Petitioners' reliance on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, is misplaced. The facts in the Heasley *381 case are distinctly different from the facts of these cases. In the Heasley case the taxpayers were not educated beyond high school and had limited investment experience, while in the instant cases Dr. Ramesh and Dr. Lalmalani were highly educated physicians, and Dr. Lalmalani had prior investment experience. The taxpayers in the Heasley case actively monitored their investment and, as the Court of Appeals for the Fifth Circuit stated, intended to profit from the investment. We cannot reach similar conclusions in the instant cases. Although Dr. Ramesh testified that he intended to profit from his investment in EI, he testified that he only discussed the potential tax advantages of the EI investment with Swartz and that the potential tax credits were crucial to his decision to invest in EI. Dr. Ramesh and Dr. Lalmalani both failed to provide evidence that they made any effort to monitor the investment. They did not furnish reliable evidence of any profit objective independent of tax savings. We note that Swartz testified that he made further investigation in 1982. However, that investigation apparently was made so he could decide whether to urge other clients to invest in 1982 *382 plastics recycling partnerships. Also, we have noted that Swartz' investigation was of little or no value since he only contacted promoters of the transaction and a lawyer who had no particular knowledge of the plastics or recycling industries. In view of all these circumstances, we consider petitioners' arguments with respect to the Heasley case inapplicable. Dr. Ramesh and Dr. Lalmalani entered into the EI investment without any knowledge or background with respect to plastics or recycling and without seeking the advice of anyone who had such knowledge. They did not examine any Sentinel EPE recyclers prior to investing in EI, and they did not seek the advice of an independent third party concerning the machines' values. Through their investments in EI, Dr. Ramesh and Dr. Lalmalani paid Clearwater $ 5,586 and $ 11,170, respectively, and claimed operating losses in the respective amounts of $ 4,469 and $ 8,944 and tax credits in the respective amounts of $ 9,644 and $ 19,302 with respect to that investment for the first year of the investment alone. Under the circumstances of this case, Dr. Ramesh and Dr. Lalmalani failed to exercise due care in claiming the large deductions *383 and tax credits with respect to Clearwater on their 1981 Federal income tax returns. We conclude that petitioners were negligent in claiming the deductions and credits with respect to EI's investment in Clearwater on their 1981 Federal income tax returns. We hold, upon consideration of the entire records, that petitioners are liable for the negligence-related additions to tax under the provisions of section 6653(a)(1) and (2) for 1981. Respondent is sustained on this issue. Issue 5. Sec. 6659 Valuation Overstatement
In her first amendments to answer, respondent asserted that petitioners were liable for the addition to tax for valuation overstatement under section 6659 on the underpayment of their 1981 Federal income taxes attributable to the investment tax credit and business energy credit claimed with respect to EI and Clearwater. Because these additions to tax were raised for the first time in respondent's amendments to answer, respondent bears the burden of proof on this issue. Rule 142(a); Vecchio v. Commissioner, 103 T.C. at 196. The underlying facts of these cases with respect to this issue are substantially the same as those in Fine v. Commissioner, T.C. Memo. 1995-222. *384 In addition, petitioners' arguments with respect to this issue are essentially identical to the arguments made in the Fine case. For reasons set forth in the Fine opinion, we hold that petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the disallowed credits for 1981. Respondent is sustained on this issue. Issue 6. Sec. 6621(c) Tax-Motivated Transactions
In the notices of deficiency, respondent determined that interest on deficiencies accruing after December 31, 1984, would be calculated under section 6621(c). The annual rate of interest under section 6621(c) equals 120 percent of the interest payable under section 6601 with respect to any substantial underpayment attributable to tax-motivated transactions. An underpayment is substantial if it exceeds $ 1,000. Sec. 6621(c)(2). The underlying facts of these cases with respect to this issue are substantially the same as those in Fine v. Commissioner, supra. In addition, petitioners' arguments on brief with respect to this issue are verbatim copies of the arguments in the taxpayers' briefs in the Fine *385 case. For reasons set forth in the Fine opinion, we hold that respondent's determinations as to the applicable interest rate for deficiencies attributable to tax-motivated transactions are sustained, and the increased rate of interest under section 6621(c) applies for 1981. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the tax year in issue, unless otherwise stated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The notices of deficiency refer to sec. 6621(d). This section was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744 and repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89), Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989, OBRA 89 sec. 7721(d), 103 Stat. 2400. The repeal does not affect the instant cases. For simplicity, we shall refer to this section as sec. 6621(c). The annual rate of interest under sec. 6621(c)↩ for interest accruing after Dec. 31, 1984, equals 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.
1. 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.↩
3. The parties did not stipulate certain facts concerning the Provizers, facts regarding the expert opinions, and other matters that we consider of minimal significance. Although the parties did not stipulate our findings regarding the expert opinions, they stipulated our ultimate finding of fact concerning the fair market value of the recyclers during 1981.↩
4. Dr. Ramesh's testimony concerning when Swartz began preparing his tax returns was contradictory. He stated that Swartz began preparing his returns in 1976 and in 1978. Swartz's testimony was also contradictory. He said that he began preparing the returns when Dr. Ramesh first went into private practice (1978) and that he started doing the returns around 1980.↩
5. The Clearwater offering memorandum states that the partnership will pay sales commissions and fees to offeree representatives in an amount equal to 10 percent of the price paid by the investor represented by such person. The offering memorandum further states that if such fees are not paid "they will either be retained by the general partner as additional compensation if permitted by applicable state law, or applied in reduction of the subscription price." The Efron Investors' Schedule K-1 for 1981 shows that EI paid full price, $ 350,000, for its seven units of Clearwater, so the 10-percent commission was not applied to reduce the subscription price. Gordon specifically stated that in the case of EI he did not directly receive the sales commission. Efron expressed doubt that he individually had been an offeree representative in connection with Clearwater or any other transaction. There are suggestions that the commission might have been paid to MFA or offeree representatives of individual investors. In fact, Swartz testified that he believed that he received a commission from EI in his capacity as the offeree representative of Dr. Ramesh and Dr. Lalmalani.↩
6. Mrs. Lalmalani did not describe the documents that she and Dr. Lalmalani received in the mail concerning Dr. Lalmalani's investment in EI.↩
1. Calculated as follows:
EI's Investment in Clearwater $ 350,000 X Ramesh's Share of EI 1.596% = $ 5,586
EI's Investment in Clearwater $ 350,000 XLalmalani's Share of EI 3.194% = $ 11,179↩