T.C. Memo. 1995-525

UNITED STATES TAX COURT

DAVID C. WILSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

REVIE CEE SOREY, II, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 21243-85, 7908-89.    Filed November 6, 1995.

<u>Lois C. Blaesing</u> and <u>Chauncey W. Tuttle, Jr.</u>, for
petitioners.

<u>Mary P. Hamilton</u>, <u>Paul Colleran</u>, and <u>William T. Hayes</u>, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge: These cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183.[1] They were tried and briefed separately but consolidated for purposes of opinion. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge: These cases are part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993). The facts of the underlying transaction in these cases are substantially identical to those in the Provizer case. Through a second tier partnership, Efron Investors, petitioners David C. Wilson (Wilson) and Revie Cee Sorey II (Sorey), invested in the Clearwater Group limited partnership (Clearwater), the same partnership considered in the Provizer case. Pursuant to petitioners' requests at trial, this Court took judicial notice of our opinion in the Provizer case.

By statutory notice of deficiency respondent determined a deficiency in Wilson's 1981 Federal income tax in the amount of

---

[1] All section references are to the Internal Revenue Code in effect for the tax years at issue, unless otherwise stated. All Rule references are to the Tax Court Rules of Practice and Procedure.

$37,959.55 and also determined that interest on deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c).[2]  In a notice of deficiency, respondent determined the following deficiencies in and additions to Sorey's Federal income taxes:

| Year | Deficiency | Increased Interest Sec. 6621(c) | Additions to Tax Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
|------|-----------|------------------|------------------|------------------|-----------|
| 1978 | $10,022 | [1] | --- | --- | $3,006.60 |
| 1979 | 382 | --- | --- | --- | 114.60 |
| 1981 | 11,737 | [1] | $586.85 | [2] | 3,521.10 |

[1]120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.

[2]50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.

The deficiencies in the Sorey case, docket No. 7908-89, for taxable years 1978 and 1979 result from disallowance of investment tax credit carrybacks and business energy credit carrybacks from taxable year 1981.  In addition to the above deficiencies and additions to tax, in amended answers, respondent asserted the following:  (1) In the Wilson case, docket No.

---

[2]    The notice of deficiency in the Wilson case, docket No. 21243-85, refers to sec. 6621(d).  This section was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744, and repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89), Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989, OBRA 89 sec. 7721(d), 103 Stat. 2400.  The repeal does not affect the instant cases.  For simplicity, we shall refer to this section as sec. 6621(c).  The annual rate of interest under sec. 6621(c) for interest accruing after Dec. 31, 1984, equals 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.

21243-85, additions to tax for 1981 in the amount of $7,364 under section 6659 for valuation overstatement, in the amount of $1,898 under section 6653(a)(1) for negligence, and under section 6653(a)(2) in an amount equal to 50 percent of the interest due on the underpayment attributable to negligence; and (2) in the Sorey case, docket No. 7908-89, additions to tax in the amount of $501 and $19 under section 6653(a) for taxable years 1978 and 1979, respectively.

In her opening brief in docket No. 7908-89, respondent asserted that Sorey was liable for the addition to tax under section 6659 for 1981 in the amount of $1,442.60, as opposed to $3,521.10 as determined in the notice of deficiency. We consider the section 6659 addition to tax for 1981 asserted in docket No. 7908-89 reduced to correspond to the amount in dispute as set forth in respondent's opening brief and amend the pleadings to conform to the proof pursuant to Rule 41(b).

The issues in these consolidated cases are: (1) Whether expert reports and testimony offered by respondent are admissible into evidence; (2) whether petitioners are entitled to claimed deductions and tax credits with respect to Clearwater as passed through Efron Investors to petitioners; (3) whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for 1981 and whether petitioner Sorey is liable for additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a) for 1978 and 1979; (4) whether

petitioners are liable for the additions to tax under section 6659 for underpayments of tax attributable to valuation overstatement; and (5) whether petitioners are liable for increased interest under section 6621(c).

## FINDINGS OF FACT

Some of the facts have been stipulated in each case and are so found. The stipulated facts and attached exhibits are incorporated in the respective cases by this reference.

Petitioners resided in Hammond, Indiana, when their petitions were filed. During 1981 Wilson was a professional football player for the New Orleans Saints. During 1978, 1979, and 1981, Sorey was a professional football player for the Chicago Bears.

Petitioners are limited partners in Efron Investors (EI), which is a limited partner in the Clearwater limited partnership. The Clearwater limited partnership is the same recycling partnership that we considered in Provizer v. Commissioner, supra. The underlying deficiencies in these cases resulted from respondent's disallowance of claimed losses and tax credits that were passed through both Clearwater and EI to petitioners.

Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, supra.[3] Those facts may be summarized as follows.

---

[3] The parties did not stipulate certain facts concerning the

(continued...)

In 1981, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel expanded polyethylene (EPE) recyclers to ECI Corp. for $5,886,000 ($981,000 each). ECI Corp., in turn, resold the recyclers to F & G Corp. for $6,976,000 ($1,162,666 each). F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. All of the monthly payments required among the entities in the above transactions offset each other. These transactions were done simultaneously. We refer to these transactions collectively as the Clearwater transaction. The fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC based on the quality and amount of recycled scrap.

In 1981, EI acquired a 43.313-percent limited partnership interest in Clearwater, Wilson acquired a 9.581-percent interest in EI, and Sorey acquired a 3.194-percent interest in EI. As a result of passthrough from Clearwater and EI, Wilson deducted an operating loss in the amount of $26,830 and claimed investment

---

[3](...continued)
Provizers, facts regarding the expert opinions, and other matters that we consider of minimal significance. Although the parties did not stipulate our findings regarding the expert opinions, they stipulated our ultimate finding of fact concerning the fair market value of the recyclers during 1981.

tax and business energy credits totaling $57,898, and Sorey deducted an operating loss in the amount of $8,945 and claimed investment tax and business energy credits totaling $19,314.[4] Wilson used $24,545 of the credits claimed with respect to his investment in EI and Clearwater on his 1981 Federal income tax return.[5] Sorey used $4,805 of his claimed credits on his 1981 return and carried back the unused portion of the credits to 1978 and 1979 in the respective amounts of $10,021 and $4,488. Respondent disallowed petitioners' claimed deductions and credits related to EI's investment in Clearwater. In docket No. 7908-89, respondent disallowed the entire loss claimed with respect to Sorey's investment in EI.

EI is an Indiana limited partnership that was formed in May of 1981 by Morton L. Efron (Efron) as the general partner and Real Estate Financial Corp. (REFC) as the initial limited partner. Fred Gordon (Gordon) is the president of REFC, which is owned by members of Gordon's family.

---

[4]    On his 1981 Federal income tax return, Sorey claimed a qualified investment for purposes of calculating the investment tax credit in the amount of $96,628, $120 more than the purported value of the Clearwater recyclers. Accordingly, Sorey claimed an investment tax credit in the amount of $9,663. Respondent disallowed Sorey's claimed investment tax credit in its entirety. The record is unclear with respect to the additional $120 claimed on Sorey's return.

[5]    The record does not disclose how or whether Wilson utilized the remaining credits reported with respect to his investment in EI.

EI was formed to acquire limited partnership interests in an office building in Buffalo, New York (the office building), and a shopping center in Haslett, Michigan (the shopping center).  In contemplation of these ventures, EI prepared a private placement memorandum (the original offering memorandum) and distributed it to potential limited partners.  At some time in late 1981, EI abandoned the contemplated investment in the shopping center and substituted limited partnership interests in Clearwater and a K-Mart shopping center in Swansea, Massachusetts (the K-Mart investment).  The revised investment objectives were presented in a revised offering memorandum (the revised offering memorandum). The revised offering memorandum indicated that EI intended to invest in 100 percent of the limited partnership interests in the office building (10 units), 43.75 percent of the limited partnership interests in Clearwater (7 units), and 15.625 percent of the limited partnership interests in the K-Mart investment (2-1/2 units).

MFA Corp. (MFA) is the ministerial agent for EI.  Efron owns 50 percent of the stock of MFA, and REFC owns the remaining 50 percent.  The revised offering memorandum provides that Efron, as general partner of EI, and MFA, as the ministerial agent for EI, will receive substantial fees, compensation, and profits from EI. The contemplated payments to MFA include:  (1) $100,000 for supervisory management of the office building and ministerial fees; (2) $100,000-$125,000 as loan commitment fees; (3) $25,000

for note collection guarantees; and (4) a maximum of $100,750 in investment advisory fees.  In addition, MFA was also the ministerial agent for the office building limited partnership and, according to the revised offering memorandum, received substantial payments in that capacity.

Efron obtained financing for the EI investments through local banks.  Like a number of limited partners in EI, petitioners in these cases made a cash downpayment to EI and then signed installment promissory notes for the remainder of the purchase price.  Thereafter, Efron pledged any promissory notes received from limited partners as security for loans to EI.  In addition to lending funds directly to EI, the banks also offered loans to individual limited partners for the downpayments needed with respect to the EI investments.  Donald Cassaday (Cassaday), a vice president of the First Bank of Whiting, was involved with arranging the financing for EI with Efron and arranged required financing for some of the EI limited partners.

Wilson and Sorey subscribed to purchase limited partnership units in EI in the respective amounts of 1-1/2 units ($150,000) and one-half of a unit ($50,000).  Wilson did not borrow any funds with respect to his investment in EI.  The record is unclear as to how Sorey financed acquisition of his investment in EI.

Wilson learned of EI and the Clearwater transaction from Efron.  In 1981, Wilson began to play professional football as a

quarterback for the New Orleans Saints of the National Football League.  Prior to playing professional football, Wilson attended a junior college in southern California for 2 years and the University of Illinois for 1-1/2 years.  He played quarterback for the University of Illinois for 1 year, but lost his eligibility to play football during his planned last year there and in 1981, decided to play in the National Football League. Wilson's college background and the litigation by which he became eligible to play football in the Big Ten for the 1980 season but was prevented from playing in that league for 1981 are described in Wilson v. Intercollegiate (Big Ten) Conference Athletic Association, 668 F.2d 962 (7th Cir. 1982).  While attending the University of Illinois, Wilson met Wayne Paulson (Paulson). Through Paulson, Wilson met Efron, who became his sports agent and his attorney for negotiation of his initial contract with the New Orleans Saints.  At the time of trial, Efron had been Wilson's sports agent for 13 years, and over the years he had responsibilities with respect to the management of Wilson's funds and investments.  Nevertheless, as to the EI investment in Clearwater in issue here, Efron sent Wilson copies of the offering circulars, kept him informed, and obtained Wilson's approval of the investment.

Sorey also learned of EI and the Clearwater transaction from Efron.  During the years in issue, Sorey was a professional football player for the Chicago Bears of the National Football

League.  Efron was Sorey's sports attorney and agent in 1981 and throughout his professional football career, commencing in 1975. Efron was involved in Sorey's business decisions, and he consulted with his client and advised him, at least as to the EI investment in Clearwater, before Sorey made the investment.

Efron was the general partner of EI.  In addition, Efron owned limited partnership interests in EI through Efron and Efron Real Estate, a partnership owned by Efron and his wife, and AMBI Real Estate, a partnership owned by Efron and his sister.  EI was the first partnership for which Efron served as a general partner.  Efron organized EI so that he could earn legal fees and fees for managing the partnership.  He received compensation and fees as the general partner of EI and as a 50-percent shareholder of MFA.  Efron learned of the Clearwater transaction from Gordon.

In 1981 Gordon was counsel to EI, to Efron as the general partner of EI, to Efron personally, and to MFA.  He and Efron have known each other since meeting at the University of Michigan in 1955.  In the early 1960's Efron and Gordon began investing together in the stock market, real estate, business loans, and other investments.  Gordon is an attorney who holds a master's degree in business administration and at one time was employed by the Internal Revenue Service.  Prior to the date of the Clearwater private placement offering, Gordon had experience involving the evaluation of tax shelters.  Gordon was paid a fee in the amount of 10 percent of some investments he guided to

Clearwater; however, he did not receive a fee directly from Clearwater for the EI investments. Efron was aware that Gordon received commissions from the sale of some units in recycling ventures.[6] Gordon recommended investing in the Clearwater offering to the investors in EI, as well as to some of Gordon's other clients.

Wilson attended a junior college in southern California for 2 years and then attended the University of Illinois for 1-1/2 years. At the University of Illinois, he majored in physical education. Wilson has had no additional formal education since leaving the University of Illinois in 1981 to play professional football for the New Orleans Saints.

Prior to entering the National Football League, Sorey attended the University of Illinois. When he was drafted by the

---

[6] The Clearwater offering memorandum states that the partnership will pay sales commissions and fees to offeree representatives in an amount equal to 10 percent of the price paid by the investor represented by such person. The offering memorandum further states that if such fees are not paid "they will either be retained by the general partner as additional compensation if permitted by applicable state law, or applied in reduction of the subscription price." The Efron Investors' Schedule K-1 for 1981 shows that EI paid full price, $350,000, for its seven units of Clearwater, so the 10-percent commission was not applied to reduce the subscription price. Gordon specifically stated that in the case of EI he did not directly receive the sales commission. Efron expressed doubt that he individually had been an offeree representative in connection with Clearwater or any other transaction. There are suggestions that the commission might have been paid to MFA or offeree representatives of individual investors, but the record on this subject is inconclusive. Wayne Paulson was Wilson's offeree representative and Norman Diamond was Sorey's offeree representative with respect to EI.

Chicago Bears in 1975, he had less than one semester of study to complete to earn his degree. In 1993, he received a bachelor of arts degree in sociology from the University of Illinois. In addition, at the time of trial, Sorey had earned credit hours in pursuit of a master's degree in athletic administration and was the director of the Hammond Boys and Girls Club of Northwest Indiana.

Petitioners do not have any formal training or work experience relating to investments. Petitioners do not have any education or work experience in plastics recycling or plastics materials. They did not independently investigate the Sentinel recyclers or see a Sentinel recycler or any other type of plastic recycler prior to participating in the recycling ventures.

OPINION

In Provizer v. Commissioner, T.C. Memo. 1992-177, a test case involving the Clearwater transaction and another tier partnership, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $50,000, (2) held that the Clearwater transaction was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of

section 6621(c).  In reaching the conclusion that the Clearwater transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that their investments in the Sentinel EPE recyclers were similar to the investment described in Provizer, and, pursuant to their request, we have taken judicial notice of our opinion in the Provizer case. Petitioners invested in EI, a tier partnership that invested in Clearwater.  The underlying transaction in these cases (the Clearwater transaction), and the Sentinel EPE recyclers considered in these cases, are the same transaction and machines considered in Provizer.

Issue 1.  Admissibility of Expert Reports and Testimony

Before addressing the substantive issues in these cases, we resolve an evidentiary issue.  At trial, respondent offered in evidence the expert opinions and testimony of Steven Grossman (Grossman) and Richard Lindstrom (Lindstrom).  At trial and in their reply briefs, petitioners object to the admissibility of the testimony and reports.

The expert reports and testimony of Grossman and Lindstrom are identical to the testimony and reports in Fine v. Commissioner, T.C. Memo. 1995-222.  In addition, petitioners' arguments with respect to the admissibility of the expert

testimony and reports are identical to the arguments made in the
Fine case.  For discussions of the reports and testimony, see
Fine v. Commissioner, supra, and Provizer v. Commissioner, supra.
For a discussion of the testimony and petitioners' arguments
concerning the admissibility of the testimony and reports, see
Fine.

For reasons set forth in Fine v. Commissioner, supra, we
hold that the reports and testimony of Grossman and Lindstrom are
relevant and admissible, and that Grossman and Lindstrom are
experts in the fields of plastics, engineering, and technical
information.  We do not, however, accept Grossman and Lindstrom
as experts with respect to the ability of the average person, who
has not had extensive education in science and engineering, to
conduct technical research, and we have limited our consideration
of their reports and testimony to the areas of their expertise.
We also hold that Grossman's report meets the requirements of
Rule 143(f).

Issue 2.  Deductions and Tax Credits With Respect to EI and
Clearwater

The underlying transaction in these cases is substantially
identical in all respects to the transaction in Provizer v.
Commissioner, supra.  The parties have stipulated the facts
concerning the deficiencies essentially as set forth in our
Provizer opinion.  Based on these records, we hold that the
Clearwater transaction was a sham and lacked economic substance.

In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Accordingly, respondent is sustained on this issue with respect to the underlying deficiency for 1981 in docket No. 21243-85 and the underlying deficiencies for 1978 and 1979 in docket No. 7908-89. With respect to the underlying deficiency for 1981 in docket No. 7908-89, we sustain respondent's disallowance of the deductions and credits claimed with respect to EI's investment in Clearwater.[7] We also note that each petitioner has stated his concession of this issue on brief. The record plainly supports respondent's determinations regardless of such concessions. For a detailed discussion of the facts and the applicable law, see Provizer v. Commissioner, supra.

Issue 3. Sec. 6653(a) Negligence

In the notice of deficiency in docket No. 7908-89, respondent determined that Sorey was liable for the negligence additions to tax under section 6653(a)(1) and (2) for 1981. Sorey has the burden of proving that respondent's determination is erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). In addition, in her first amendments to answer,

_____

[7] Respondent determined that Sorey was not entitled to any deduction on his 1981 Federal income tax return with respect to his investment in EI, however the notice of deficiency states that only items "reported with respect to your [Sorey's] equipment leasing activities for the year 1981 in Efron Investors, Ltd. Partnership are disallowed." We sustain only respondent's disallowance of the losses and credits claimed with respect to EI's investment in Clearwater.

respondent asserted that Wilson was liable for the negligence additions to tax under section 6653(a)(1) and (2) for 1981, and that Sorey was liable for the negligence additions to tax under section 6653(a) for 1978 and 1979. Because these additions to tax were raised for the first time in respondent's amendments to answer, respondent bears the burden of proof on these issues. Rule 142(a); Vecchio v. Commissioner, 103 T.C. 170, 196 (1994).

Section 6653(a) for 1978 and 1979 and section 6653(a)(1) for taxable year 1981 provide for an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) for taxable year 1981 provides for an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973).

As a result of their investments in EI, petitioners had available to them investment tax and business energy credits with respect to EI's investment in Clearwater that exceeded their

respective investments in Clearwater.  The table below shows the
amounts of credits related to Clearwater available to petitioners
and the amounts of petitioners' investments in Clearwater through
EI.

| Petitioners | Investment Tax and Business Energy Credits | Investment in Clearwater[1] |
|---|---|---|
| Wilson | $57,898 | $33,533 |
| Sorey | 19,314 | 11,179 |

[1]Calculated as follows:

EI's Investment in Clearwater      Wilson's Share of EI
         $350,000                    x          9.581%          =$33,533

EI's Investment in Clearwater   x   Sorey's Share of EI
         $350,000                              3.194%          =$11,179

The total benefits available to petitioners were not used
entirely on their 1981 tax returns.  Wilson deducted an operating
loss of $26,830, attributable to the Clearwater investment, and
used $24,545 of the credits on his 1981 return.  The record does
not disclose Wilson's use of the additional credits, whether for
carryover to later years in which he continued employment as a
professional football player or otherwise.  Sorey used $4,805 of
the claimed credits on his 1981 return and carried back $10,021
of credits to 1978 and $4,488 of credits to 1979.  Like the
taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177,
"except for a few weeks at the beginning, petitioners [Wilson and
Sorey] never had any money in the [Clearwater] deal."  In light
of the large tax benefits claimed on petitioners' 1981 Federal
income tax returns, and available for prompt use on their other
tax returns, we conclude that further investigation of the

investment clearly was required. A reasonably prudent person would have asked a qualified independent tax adviser if this windfall were not too good to be true. McCrary v. Commissioner, 92 T.C. 827, 850 (1989).

Petitioners contend that they were reasonable in claiming deductions and credits with respect to EI's investment in Clearwater. To support their contention, petitioners allege that they were so-called unsophisticated investors and that in claiming the deductions and credits, they relied on qualified advisers. Wilson and Sorey each argue that their reliance on the advice of Efron insulates them from the negligence additions to tax. In addition, Wilson contends he relied on Paulson, his offeree representative with respect to his investment in EI, and Sorey contends that he relied on Cassaday, his banker, and Norman Diamond, his accountant and offeree representative with respect to EI. Wilson and Sorey argue that they are not liable for the negligence additions to tax because of their reliance on those individuals.

Under some circumstances a taxpayer may avoid liability for the additions to tax for negligence under section 6653(a) if reasonable reliance on a competent professional adviser is shown. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Id. In

order for reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the reliance must be reasonable, in good faith, and based upon full disclosure. Id.; see Weis v. Commissioner, 94 T.C. 473, 487 (1990); Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974).

In 1981, Wilson began to play professional football for the National Football League. He was 22 years old at that time. Wilson acquired his interest in EI in 1981 upon the recommendation of his sports agent and attorney, Efron. Wilson met Efron through a mutual friend, Wayne Paulson. He met Paulson while he was at the University of Illinois. He transferred there in 1980, so in 1981, Paulson and Efron were recent acquaintances of Wilson. Wilson was represented by other counsel in his litigation with the Big Ten concerning his football eligibility. Efron represented Wilson as agent and attorney with respect to Wilson's initial contract to play professional football, and Efron arranged for his substantial fee to be withheld from Wilson's compensation and paid directly to Efron. Wilson had no significant savings and had made no investments prior to his purchase of 1-1/2 units of EI, with a face value of $150,000. In connection with this very large investment, Efron provided Wilson a copy of the offering memorandum and discussed it with him, and also provided a copy of the revised offering memorandum, which

included a description of the Clearwater transaction, and discussed that with Wilson by telephone.  Paulson served as Wilson's offeree representative as to EI, and he discussed the investment with Wilson by telephone.  Wilson explained that the conference was by telephone since he was in New Orleans and Paulson was in Indiana in 1981.  As noted above, Morton Efron was the general partner in EI and had a substantial financial interest in the partnership and in its management.  Wayne Paulson had introduced Wilson to Efron.  See Paulson v. Commissioner, T.C. Memo. 1995-387, concerning Wayne Paulson's brother, as to the relationship between Efron and Paulson.

Efron was also Sorey's attorney and agent for his football contracts in 1981.  Efron had represented Sorey since he began playing professional football in 1975.  In 1981, Sorey was 26 years old.  Sorey testified that Efron was involved in all of his business decisions.  Sorey learned of EI through the original offering memorandum, which Efron sent to him.  Prior to 1981, Sorey's only investments were real estate investments in which Efron was involved and "some land deals" with his family.  Sorey's offeree representative with respect to EI was Norman Diamond, his accountant, who had been introduced to Sorey early in his career by Efron.  The record does not indicate that Diamond made any extensive investigation of EI for Sorey's benefit.  Sorey also discussed EI with Cassaday, the banker who,

as discussed above, was significantly involved in the financing of EI.

Petitioners Wilson and Sorey contend that they relied heavily on Efron in making their investments in EI and in claiming the associated tax deductions and credits. Petitioners argue that they should be relieved of the negligence additions to tax under section 6653(a) because of their reliance on Efron. Both Wilson and Sorey testified that they reviewed the original offering memorandum and understood that EI was to invest solely in real estate. They testified that in early 1982, after they invested in EI, they learned that the nature of the EI investment had changed from a strictly real estate deal to a deal including a recycling investment. Although petitioners Wilson and Sorey had an opportunity to read the revised offering memorandum, the record indicates that they chose to spend little time on studying the matter but chose, instead, to rely primarily upon the advice of their advisers.

We have rejected pleas of reliance when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. Beck v. Commissioner, 85 T.C. 557 (1985); Flowers v. Commissioner, 80 T.C. 914 (1983); Steerman v. Commissioner, T.C. Memo. 1993-447. The record does not show that Efron possessed any special qualifications or professional skills in the recycling or plastics industries. In addition, Efron did not

hire anyone with plastics or recycling expertise to evaluate the Clearwater transaction. The record does not indicate that Paulson, Cassaday, or Diamond had any plastics or recycling expertise.

The offering memorandum for EI and the revised offering memorandum disclosed the fact that Efron was receiving substantial compensation and fees as the general partner of EI and as a 50-percent owner of MFA. In addition, both of the EI offering memoranda specifically warned potential investors that they were "not to consider the contents of [the offering memoranda] or any communication from the partnership or its general partners as legal or tax advice", and Efron testified that he advised every limited partner in EI to talk to an independent adviser. Petitioners had ample resources to employ such advisers, but they chose not to do so. Instead, they chose to rely on Efron and his close associates, Paulson, Cassaday, and Diamond. Paulson had referred Wilson to Efron; Cassaday was the banker who was heavily involved in financing EI; and Diamond was the accountant who initially was referred to Sorey by Efron.

In these cases, Efron's conflicts of interest were substantial and were ostentatiously displayed in the offering memoranda. Efron himself testified that he urged investors to consult independent advisers. Certainly, Efron was not an independent adviser, and he surely is not a person upon whom Wilson and Sorey could rely in negotiations with EI. His own

testimony indicates as much.  Paulson, Cassaday, and Diamond all were associated with Efron, and the record indicates that petitioners should have known about such associations.

With respect to petitioners' claimed heavy reliance on Efron, a promoter and general partner in EI, we recently have suggested that advice from such persons "is better classified as sales promotion."  See Vojticek v. Commissioner, T.C. Memo. 1995-444.  The other individuals with whom petitioners claim to have discussed the Efron investment were closely associated with Efron, had no expertise in plastics or recycling, and in any event, were not heavily relied upon by petitioners.

Petitioners' reliance on brief on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, is misplaced.  The facts in the Heasley case are distinctly different from the facts of these cases.  In the Heasley case, the taxpayers actively monitored their investment.  Petitioners have provided no evidence that they made any effort to monitor their investment in EI.  Their testimony indicates that they paid only casual attention to the shift of a major portion of the investments of EI from real estate to plastics recycling.  In addition, the taxpayers in the Heasley case were not educated beyond high school.  Wilson had completed 3-1/2 years of college, and Sorey was only a few credits short of requirements for his B.A. degree from the University of Illinois at the time of their investments in EI.  In contrast to the diligent but relatively

uneducated so-called blue-collar workers in <u>Heasley</u>, petitioners were essentially college educated and relatively wealthy young men. Aside from their own abilities to read and consider the proposed investment in EI, petitioners had the resources to employ competent independent advisers and had been fully warned that they should do so. Unlike the taxpayers in <u>Heasley</u>, petitioners here chose to pay little attention to their investments and to ignore the admonitions in the offering circular that they should consult with capable independent advisers. We consider petitioners' arguments with respect to the <u>Heasley</u> case inapplicable to the circumstances here.

From the record in these cases, we conclude that respondent has satisfied her burden of proving negligence in the Wilson case for 1981 and in the Sorey case for 1978 and 1979, and that Sorey has failed to satisfy his burden of proof as to respondent's determination of negligence for 1981. We hold that petitioner Sorey is liable for the negligence addition to tax for 1978, 1979, and 1981, and that petitioner Wilson is liable for such addition to tax for negligence for 1981.

<u>Issue 4. Sec. 6659 Valuation Overstatement</u>

Respondent determined that Sorey was liable for the additions to tax for valuation overstatement under section 6659 on the underpayments of his 1978, 1979, and 1981 Federal income taxes attributable to the investment tax credits and business

energy credits claimed with respect to EI and Clearwater.[8]  Sorey has the burden of proving respondent's determinations of these additions to tax erroneous.  Rule 142(a); Rybak v. Commissioner, 91 T.C. 524, 566 (1988).  Additionally, in a first amendment to answer, respondent asserted that Wilson was liable for the addition to tax for valuation overstatement under section 6659 on the underpayment of his 1981 Federal income tax attributable to the investment tax credit and business energy credit claimed with respect to EI and Clearwater.  Because this addition to tax was raised for the first time in respondent's amendment to answer, respondent bears the burden of proving that Wilson is liable for the section 6659 addition to tax.  Rule 142(a); Vecchio v. Commissioner, 103 T.C. at 196.

The underlying facts of these cases with respect to this issue are substantially the same as those in Fine v. Commissioner, T.C. Memo. 1995-222.  In addition, with the exception of arguments pertaining to respondent's failure to waive the section 6659 additions to tax, petitioners' arguments with respect to this issue are identical to the arguments made in

---

[8]     As noted, supra p. 4, on brief respondent decreased the amount of the sec. 6659 addition to tax asserted with respect to taxable year 1981 in docket No. 7908-89.  The amount of the 1981 sec. 6659 addition to tax asserted in respondent's opening brief corresponds to the amount of a sec. 6659 addition to tax calculated by applying sec. 6659 only with respect to the EI credits utilized on Sorey's 1981 Federal income tax return. Credits utilized on Sorey's 1981 return in the amount of $4,805 times 30% equals $1,442, the amount of the sec. 6659 addition to tax asserted in respondent's opening brief.

the Fine case.  For reasons set forth in the Fine opinion, we hold that petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the disallowed credits claimed with respect to EI and Clearwater.[9]

Petitioners contend that respondent abused her discretion in failing to waive the section 6659 additions to tax pursuant to section 6659(e).  Section 6659(e) authorizes the Commissioner to waive all or part of the addition to tax for a valuation overstatement if the taxpayer establishes that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith.  The Commissioner's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion.

On these records, we hold that respondent did not abuse her discretion in failing to waive the section 6659 additions to tax. The records in these cases do not show that petitioners' valuations were reasonable.  In addition, the records fail to indicate that petitioners ever requested a waiver from respondent pursuant to section 6659(e) until briefing after trial.  We are

---

[9]    Sec. 6659 applies to returns filed after Dec. 31, 1981. Although petitioner Sorey filed returns for 1978 and 1979 prior to Dec. 31, 1981, he is liable for the additions to tax under sec. 6659 for 1978 and 1979 because the underpayments of tax for those years are attributable to the carryback of unused tax credits claimed on his 1981 return.  See Nielsen v. Commissioner, 87 T.C. 779 (1986).

reluctant to find that respondent abused her discretion here when, for all the records show, she was not even timely requested to exercise it.  See Haught v. Commissioner, T.C. Memo. 1993-58; Lapin v. Commissioner, T.C. Memo. 1990-343, affd. without published opinion 956 F.2d 1167 (9th Cir. 1992).  The records in these cases do not establish an abuse of discretion on the part of respondent but support respondent's position.  Accordingly, we hold that respondent's refusal to waive the section 6659 additions to tax is not an abuse of discretion.

Issue 5.  Sec. 6621(c) Tax-Motivated Transactions

In notices of deficiency, respondent determined that interest on deficiencies accruing after December 31, 1984, would be calculated under section 6621(c).  The annual rate of interest under section 6621(c) equals 120 percent of the interest payable under section 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.  An underpayment is substantial if it exceeds $1,000.  Sec. 6621(c)(2).

The underlying facts of these cases are substantially the same as those in Fine v. Commissioner, supra.  In addition, petitioners' arguments on brief with respect to this issue are verbatim copies of the arguments in the taxpayers' briefs in the Fine case.  For reasons set forth in the Fine opinion, we hold that respondent's determination as to the applicable interest rate for deficiencies attributable to tax-motivated transactions

is sustained, and the increased rate of interest applies for the taxable years in issue.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.